411 So.2d 643 (1982)
Michael A. DOLLACKER and Ellen Dollacker, his wife
v.
James A. SCHIMEK, and United Service Automobile Association.
No. 12680.
Court of Appeal of Louisiana, Fourth Circuit.
March 9, 1982.
Writ Denied April 30, 1982.
*644 Martzell & Montero, John R. Martzell, Janine Dingleman, New Orleans, for plaintiffs-appellants.
Timothy G. Schafer, New Orleans, for defendant third-party plaintiff-appellee.
Before BARRY, BYRNES and WARD, JJ.
BARRY, Judge.
Plaintiff appeals the sufficiency of a general damage award urging that the lower court erred in failing to include specific items of damage.
Plaintiff sued her uninsured motorist carrier for personal injuries received in a two car collision and was awarded medical expenses of $2,040.52, $4,802.24 for lost wages, and $15,000.00 for pain and suffering. Plaintiff only appeals as to "pain and suffering" and argues that the amount is insufficient because the Trial Judge did not include recovery for permanent disability, a scar, or loss of future wages, and asks that expert fees be set. The defendant insurer answers that the Trial Judge is not required to itemize general damages, the quantum was adequated because it included all proven damages, and there was no proof of future wage loss. There is no question of liability.
Plaintiff contends the judgment is not a general verdict and the factfinder erred in not itemizing sums for permanent disability and scar disfigurement and cites Roy v. Schneider, 367 So.2d 1314 (La.App. 4th Cir. 1979). In Roy a jury only awarded $305.00 in a general verdict; however, that was the exact amount of medical expenses and the court held that the jury failed to make any award for general damages which was an error of law. The defendant argues, and we agree, that "pain and suffering" can encompass a variety of general damages, such as various injuries and residual disability. Picou v. Highlands Insurance Co., 298 So.2d 307 (La.App. 1st Cir.) writ refused 302 So.2d 25 (La.1974). There is no prohibition against a lump sum verdict and the Trial Judge does not have to detail what constitutes "pain and suffering".
Our concern is directed to the sufficiency of the award for pain and suffering. Plaintiff was a twenty-four year old student nurse at the time of the accident in July, 1975. She was taken to the emergency room at Mercy Hospital, x-rayed, and the next day saw Dr. S. J. Lococo, an orthopedic surgeon.
Dr. Lococo's examination revealed a positive finding of knee effusion and internal derangement which is common when the knee is twisted. There was also fluid in the knee area. Dr. Lococo stated that plaintiff continued to have pain and swelling in the knee, and the knee instability (giving away) indicated she had a patella malalignment syndrome which was related to the accident. Surgery was performed in December, 1975 which confirmed malalignment of the knee cap with thin tissues on the medial border. The patella was stretched, ruptured, swollen and painful and the left leg had limitation of motion with quadricep atrophy. The patella was surgically realigned and required extensive suturing. Plaintiff was in the hospital ten days and the knee was immobolized for six weeks. Dr. Lococo followed her extensively and stated she continued to have pain, swelling, and never fully recovered.
Plaintiff and her husband moved to Dallas and Dr. Lococo followed her progress through his referral, Dr. Faust. Dr. Lococo was allowed to testify that Dr. Faust sent him reports on plaintiff's condition and Dr. Faust stated that he would not prescribe anti-inflammatory drugs because of her possible pregnancy. Plaintiff corresponded with Dr. Lococo and told him that her knee continued to cause problems and the surgery was not successful.
Dr. Lococo examined plaintiff prior to trial and said the knee appeared stable and was properly aligned; however, she complained the knee gave way approximately every three months and there was pain and *645 swelling with increased activities. Dr. Lococo felt plaintiff had approximately fifteen percent disability of the left lower extremity and he expressed concern over the appearance of the surgical scar. Dr. Lococo recommended quadricep exercise with Tylenol for pain and decreased activities when there was knee swelling.
Testimony from Dr. John B. Gunn, an orthopedic surgeon in Dallas, was taken by deposition. He stated plaintiff was referred to him by Dr. Faust and he first saw her on October 18, 1977 (the accident occurred July, 1975) and she complained about knee pain and inability to participate in sports. She told Dr. Gunn of her surgery by Dr. Lococo in December, 1975 and the necessity thereafter to have fluid drained on three of four occasions. Dr. Gunn testified plaintiff's quadriceps were abnormal because she lacked twenty-five to thirty percent of normal muscle strength and there was atrophy. He said plaintiff experienced pain upon manipulation of the knee cap and crepitus was present. Dr. Gunn opined that fluid in the knee joint meant pathology within the knee which usually leads to degenerative changes that would necessitate additional surgery. Dr. Gunn said that surgery would only have a fifty percent chance of success and the optimum after surgery would be seventy-five to eighty percent relief of pain and joint effusion.
After this initial examination by Dr. Gunn, plaintiff went back to Dr. Faust to discuss the merits of surgery and ultimately decided that the surgical risks were worth the potential elimination of pain and discomfort. The second surgery was on December 21, 1977, (two and a half years post accident) and it was discovered plaintiff had moderate chondromalacia, very early roughening. Dr. Gunn also found a residual tightness from the first surgery where the knee cap was bound down against the femur which caused an abnormal amount of pressure when the knee was flexed. During surgery the knee cap was displaced to its normal position to relieve tightness and reduce crepitus. Plaintiff was in the hospital seven days, her leg placed in a cast, and used crutches for four weeks after which the cast was removed and motion exercises were prescribed. Approximately ten weeks after surgery there was a slight joint effusion, some fluid, and the quadriceps were about ten to fifteen percent abnormal. Approximately fifteen weeks post surgery plaintiff had increased soreness, tenderness, swelling, and was placed on an anti-inflammatory drug. Dr. Gunn's last examination prior to the deposition was approximately four months post operative and there was no effusion or crepitus, but there was continued tenderness of the patella.
Dr. Gunn's prognosis was intermittent difficulty with the knee which would be aggravated by going up and down steps, squatting or participating in sports. At the time of the deposition Dr. Gunn stated "with a major weight-bearing joint like this where you're dealing with the largest joint that we have, and the most complicated one, it takes a long time to recover from surgery ... I think she'd have difficulty working in the operating room, emergency room, or intensive care, wherein she could probably handle ordinary floor activity." He felt optimum results would be achieved nine to twelve months after surgery and his prognosis was "guarded". It was stipulated between counsel if Dr. Gunn had testified his evaluation would be a twenty-five to thirty percent permanent disability of the left knee.
Dr. Claude Williams, orthopedic surgeon, examined plaintiff at defendant's request on three occasions. On October 15, 1975 (three months post accident) he found tenderness of the knee joint lining with crepitus and a slight prominence of the medial meniscus. She had full flexion and x-rays revealed no fractures or dislocation. Dr. Williams felt she might have damage to the cartilage and suggested if the symptoms persisted radiological testing might be appropriate. He suggested that she continue seeing Dr. Lococo.
Plaintiff saw Dr. Williams again on September 23, 1976 (nine months after the first surgery) and x-rays were negative, there *646 was no effusion of the knee joint, and the knee exhibited full mobility. The physician did note a six inch scar from the surgery.
Dr. Williams last saw plaintiff immediately prior to trial which was seventeen months after the second surgery by Dr. Gunn. He said plaintiff complained her knee would swell after being on her feet more than six hours, but she did not use medication because of nursing her baby. Dr. Williams noted the knee was not swollen and there was no detectable effusion in the joint; however, there was visible atrophy of the thigh muscle. There was also noticeable crepitus upon flexion and extension of the knee and complaints of tenderness about the patella. Dr. Williams felt that no additional surgery was warranted and estimated a fifteen percent permanent partial impairment of the left lower extremity as a whole. He stated plaintiff should continue with exercises, but would have trouble with activities that required squatting, running, or any activity with the knee in a flexed position. The physician did not dispute plaintiff's complaints of pain.
We have reviewed the medical evidence in detail because we are satisfied that $15,000.00 for pain and suffering is woefully inadequate. In summary, this plaintiff was twenty-four years old at the time of the accident and twenty-eight years old at trial. Both treating surgeons estimated leg problems and pain for the rest of her life. Dr. Lococo felt the left lower extremity had a fifteen percent permanent disability and it was stipulated that Dr. Gunn would evaluate a twenty-five to thirty percent permanent disability. Defendant's examining physician, Dr. Williams, basically agreed with the treating physicians and rated a fifteen percent permanent partial impairment of the leg. With these medical findings we note plaintiff will experience pain during her forty-five year lifespan. In addition, plaintiff's social activities are severely curtailed and even though she can resume employment, a full days work would be accomplished in pain. We viewed a photograph of the surgical scar which is approximately seven inches long, ugly in appearance, and easily noticeable.
Without written reasons we do not know how the Trial Judge arrived at a lump sum of $15,000.00 for pain and suffering. But the record supports our determination that the lower court abused its much discretion in setting such a deficient award. Our function is to raise the quantum to the lowest point which is reasonable, rather than decide what is appropriate based on the evidence. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). Under the guidelines of Reck v. Stevens, 373 So.2d 498 (La.1979) we have articulated why this particular victim, with her particular injury and resultant surgical history, the medical certainty that pain and difficulty will follow during her lifetime, plus the residual scar: all of these factors cause us to evaluate plaintiff's past and future pain and suffering, permanent disability, and disfigurement at $60,000.00 as the lowest point which is reasonable.
Next, plaintiff argues that the Trial Judge erred by awarding past lost wages without any provision for future wage loss. Plaintiff testified she was unable to stand up more than four to six hours and had to limit employment to private duty nursing because emergency room and intensive care work was impossible. After the second surgery in December, 1977, she worked as a counselor for a psychiatric unit, but was restricted to a twenty-four hour work week. This employment continued through October, 1978 when plaintiff's obstetrician advised her to quit because of pregnancy. Plaintiff's child was born in March, 1979 and she has not worked nor sought employment since October, 1978; however, she testified that when her son was one year old she would resume her career.
Dr. Gunn testified his examination four months after the second surgery was too early to determine plaintiff's ability to resume employment. Dr. Williams examined plaintiff one day before the trial and testified she was not impaired from working as a hospital staff nurse. Dr. Lococo testified that plaintiff could perform any nursing duties for a full eight hours. Plaintiff *647 countered with an expert (the Director of nursing at Charity Hospital) who stated that a staff nurse spends less than one-fourth of her time at a desk, and the balance involves physical work such as bathing, lifting patients, stooping-generally not sedentary work.
Despite plaintiff's admitted partial permanent leg disability, we find no medical evidence to support the claim that her work life was impaired to an extent that would preclude or reduce future earnings. Plaintiff quit work because of her pregnancy and never resumed nor sought employment thereafter. Any attempt by us to determine future wage loss would be speculative and this claim has no substance other than plaintiff's self-serving testimony. The Trial Judge's denial of future lost income was proper and not manifest error. Canter v. Koehring Co., 283 So.2d 716 (La.1973).
Finally, plaintiff requests this court set expert witness fees for the physicians. The judgment awarded "all costs" which includes expert fees which may be fixed and taxed under a rule filed for that purpose in the trial court. LSA-C.C.P. Art. 1920. There is no evidence in this record relating to these fees and the trial court is in a better position to assess the costs.
For the above reasons the judgment of the District Court is amended to provide pain and suffering in the sum of $60,000.00 in favor of plaintiff and in all other respects is affirmed. Costs of appeal are to be paid by defendants.
AMENDED AND AFFIRMED.