662 So.2d 161 (1995)
Melvin GRAHAM, Plaintiff-Appellant,
v.
WILLIS-KNIGHTON MEDICAL CENTER, et al., Defendant-Appellee.
No. 27,338-CA.
Court of Appeal of Louisiana, Second Circuit.
September 29, 1995.
Order Denying Rehearing in Part and Granting Rehearing in Part November 1, 1995.
*162 Nelson & Hammons by John L. Hammons, Shreveport, for appellant.
Cook, Yancey, King & Galloway by Albert M. Hand, Jr., Shreveport, Blanchard, Walker, O'Quin & Roberts by Joseph W. Woodley, Shreveport, and Jack M. Bailey, Jr., Shreveport, for appellee.
Before NORRIS and BROWN, JJ., and PRICE, J. Pro Tem.
NORRIS, Judge.
After a failed revascularization surgery which resulted in the loss of his right leg, Melvin Graham settled with the negligent surgeon and his insurer for their policy limits. Graham then pursued his claim for excess damages against the Louisiana Patient's Compensation Fund (the "Fund"). The district court rejected the claim; Graham now appeals. We conclude the court erred in failing to find that the settlement agreement resolved the question of the Fund's liability, and in failing to find that Graham's damages exceeded the amount of the settlement. We therefore reverse and render.

Factual and procedural background
Graham was a 60-year old man with a history of vascular problems, diabetes and smoking when he was involved in an argument at a bar on Hwy. 171 in southern Caddo Parish on August 9, 1991. Around 9:30 p.m., he was shot in the abdomen. Rescue *163 personnel airlifted him by helicopter to Willis-Knighton Medical Center; he arrived at 10:32. There, Dr. Forrest Wright, a general surgeon, performed a laparotomy (an opening of the abdomen wall) and found that Graham had sustained two serious injuries: perforated small intestines, with digestive materials leaking into the body cavity, and a transected (cut at an angle) right external iliac artery, depriving the right leg of 90-95% of its blood supply.
Dr. Wright began surgery at 11:40 p.m., litigating (clamping shut) the damaged artery and repairing the small intestine. When this was done, about 1:30 a.m., he closed the abdomen and sent Graham to the recovery room. He testified that vascular repair (operating on a blood vessel) was out of his area of expertise so he did not work on the severed artery. For some reason, however, he did not promptly call for a vascular surgeon who could do the operation.
Roughly one hour later, about 2:30 a.m., Dr. Wright phoned the LSU Medical Center and requested a transfer. About another hour later, at 3:30 a.m., he actually signed a transfer order.
After these delays, Graham arrived at LSU at 5:15 a.m. Dr. Lou Smith, one of the trauma unit surgeons, testified that she knew only that the patient's artery had been ligated and that he either needed revascularization (surgery to restore blood flow to the right leg) or he would have to have the leg amputated. She and Dr. Kennan Buechter, the director of the trauma unit, opened Graham's upper leg and performed a femoral-to-femoral bypass, diverting blood from his left artery to his right. They completed this surgery at 7:15 a.m.
Their efforts came too late; by then Graham's leg had gone nearly 10 hours without significant blood flow. The following day gangrene was apparent so surgeons amputated his leg above the knee. Later, however, they discovered his upper leg was also infected; on August 14 they amputated the remainder of his leg above the hip joint. While he was still in the hospital, doctors also discovered some gangrene in the toes of his left foot. In early September they amputated the front of that foot. With a missing leg and a remaining foot that will only imperfectly bear weight, Graham can now walk only with extreme difficulty on crutches and is prone to falling.
After discovery began but before a medical review panel received any evidence, Dr. Wright and his insurer tendered to Graham policy limits of $100,000 in exchange for their release from the claim; Graham accepted this, reserving all rights against the Fund.[1] The district court approved the settlement; Graham proceeded to trial against the Fund in September 1993.
Three medical experts testified. For the plaintiff, by deposition, were Drs. Buechter and Smith, the general surgeons at LSU who performed the femoral-to-femoral bypass; and for the Fund was Dr. Larry Hiller, a vascular surgeon. None of them faulted Dr. Wright for performing the intestinal repair before the bypass, or for declining to perform the bypass himself if he felt it was beyond his field of expertise. Drs. Smith and Buechter testified that Dr. Wright's failure promptly to summon another surgeon or arrange for the bypass unnecessarily compromised any chance of saving the leg. Most healthy patients have a four- to six-hour "window of opportunity" from the time circulation is cut off, during which the chance of full recovery is excellent, about 90-95%. Although Graham reached LSU somewhat later than the window of opportunity, Drs. Smith and Buechter they testified that they would not have started the bypass had they not felt the leg still looked good enough to salvage. Dr. Hiller agreed that quicker action to restore blood flow would have improved the chances of saving the leg, but felt that on the facts presented Graham probably would have lost it anyway. He testified that a patient like Graham, with advanced atherosclerosis, had only a three- or four-hour window of opportunity for an excellent result; with the delays of transport, completing the intestinal surgery, and performing a 1½-hour arteriogram *164 (which he felt was imperative before performing the bypass), Graham's circulation could not have been restored until long after his window of opportunity closed. He agreed with the other doctors, however, that even after the window of opportunity closes, there is still a chance of saving the leg.

Action of the district court
By written opinion, the district court related the facts, observing that Graham spent a "short time" in the Willis-Knighton recovery room before being taken to LSU "at about 3:30 a.m." The court found that bypass could not have begun until the abdominal surgery was completed at 1:30 a.m. and the 1½-hour arteriogram recommended by Dr. Hiller was performed. The court further found that Graham's window of opportunity was only two to four hours. It concluded that even if revascularization had begun immediately after Dr. Wright finished the abdominal surgery, it would have been too late to save the leg; the evidence therefore "precludes a finding * * * that Mr. Graham, more probably than not, lost a chance of better recovery as a result of Dr. Wright's delay in the revascularization procedure." The court further found that the only harm engendered by Dr. Wright's delay was the risk and discomfort of subjecting Graham to a separate operation for the bypass; other complications he sustained were not related to Dr. Wright's conduct. The court concluded that Graham's recoverable damages did not exceed the $100,000 policy limits already paid, and therefore denied further recovery against the Fund.

Applicable law
The Fund's liability in the event of a settlement between the claimant and the health care provider or its insurer is regulated by the Medical Malpractice Act (the "Act"), R.S. 40:1299.44C(5), which provides in pertinent part:
In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund, the court shall consider the liability of the health care provider as admitted and established where the insurer has paid its policy limits of one hundred thousand dollars, or where the self-insured health care provider has paid one hundred thousand dollars.
In other words, once a health care provider settles for $100,000, liability for malpractice is admitted and the only issue between the claimant and the Fund is the amount of damages. Stuka v. Fleming, 561 So.2d 1371 (La.1990), cert. denied 498 U.S. 982, 111 S.Ct. 513, 112 L.Ed.2d 525 (1990); Koslowski v. Sanchez, 576 So.2d 470 (La. 1991). In the recent case of Jones v. St. Francis Cabrini Hosp., 94-2217 (La. 4/10/95), 652 So.2d 1331, the Supreme Court reasserted that a settlement under the Act is an admission and establishment of liability for the "original harm," which the Fund is not permitted to refute or challenge at trial. Id., at 1335. If, however, the plaintiff seeks damages for subsequent or secondary harms, she must prove these by the traditional duty/ risk analysis of Dixie Drive It Yourself Syst. v. American Beverage Co., 242 La. 471, 137 So.2d 298, 304 (1962), to show that those injuries or death were "connected with the original harm." Jones, 652 So.2d at 1335-1336.
The claimant in a malpractice action need not show that he would have obtained a perfect outcome in the absence of the malpractice. Rather, he may recover on a showing that the health care provider's negligence denied him a chance of a good outcome. Smith v. State through DHHR, 523 So.2d 815, 820-821 (La.1988); Tabor v. Doctors Memorial Hosp., 563 So.2d 233 (La.1990); Ambrose v. New Orleans Police Dept. Ambulance Serv., 93-3099, p. 3 (La. 7/5/94), 639 So.2d 216, 219.
A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is plainly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). On appellate review, the issue is not whether the trial court was right or wrong, but whether its conclusion was a reasonable one. Stobart v. State through DOTD, 617 So.2d 880, 882 (La.1993). Neither ordinary conflicts in testimony, nor the appellate court's mere disagreement with the trial court's conclusions, will constitute sufficient grounds for reversal. *165 Arceneaux v. Domingue, 365 So.2d 1330, 1335 (La.1978).

Discussion: Trial on liability
By his fourth assignment, Graham urges the district court misinterpreted the Act by failing to consider anything more than the quantum of damages occasioned by Dr. Wright's admitted malpractice. In support he cites the provision that after a settlement between the claimant and the health care provider, the liability of the Fund is "admitted and established." R.S. 40:1299.44C(5); Stuka v. Fleming, supra. He contends the court erred in treating causation as separate from liability, and particularly in dismissing the claim on a finding that Graham's injuries would have occurred even without Dr. Wright's negligence. The Fund argues in brief that the district court's methodology was correct. Both parties claim support from the Supreme Court's recent opinion of Jones v. St. Francis Cabrini Hosp., supra.
In Jones the elderly Mrs. Jones went to St. Frances Cabrini with a broken hip; while there, doctors also suspected bleeding in the stomach or colon. Thus in addition to inserting a screw nail to repair her hip, doctors performed a barium enema test which required the insertion of a rectal tube. The latter procedure caused a pararectal tear, necessitating a colostomy. During her recovery, a nurse negligently allowed her to place weight on the broken hip, leading to a separation of the bone. Thereafter the patient had trouble changing the colostomy bag so she went to Rapides General to reverse that procedure. The reversal, however, was complicated and left her with severe bleeding; two corrective ileostomies were performed, but they failed to stop the bleeding. The patient died as a result. Her survivors sued St. Frances, alleging 11 acts of negligence (10 pertaining to the rectal perforation and one to the hip separation). The survivors settled with St. Frances for the maximum amount of $100,000 under R.S. 40:1299.44C and went to trial against the Fund. At trial the Fund argued to the jury that only the hip separation was admitted, not the rectal perforation. The jury awarded damages for Mrs. Jones's pain and suffering, as well as for one survivor's mental anguish, but denied all recovery for wrongful death. On appeal by the survivors, the court of appeal affirmed the rejection of the wrongful death claim. The Supreme Court granted writs.
The Supreme Court held first that once one health care provider settles for $100,000, liability for malpractice is admitted and the only issue between the victim and the Fund is the amount of damages. Jones, 652 So.2d at 1335. Obviously referring to the allegations in suit, the court found that St. Frances by settling admitted liability for both the hip separation and the rectal tear, which it referred to as the "original harm," and the Fund could not deny at trial its liability for any element of the original harm. Second, the court discussed whether the subsequent injuries (the ileostomies and the patient's death) were compensable. The court applied the duty/risk analysis to determine whether these were "connected" with the original harm. Id. The court found that St. Frances's duty not to harm the patient encompassed the risk that she would undergo corrective procedures that might ultimately result in her death. In the language of duty/ risk, the court held that it was:
reasonably foreseeable that Mrs. Jones, having been forced to submit to a colostomy due to Cabrini's negligent perforation of her rectum, would seek to have this procedure reversed, especially in light of her difficulty in managing the colostomy bag[.]
652 So.2d at 1336.
The court therefore increased the jury award of pain and suffering to encompass that arising from the ileostomies, awarded all the medical bills associated with the ileostomies and complications, and awarded wrongful death damages to each of the plaintiffs. 652 So.2d at 1336-1337.
Both aspects of the twofold Jones holding apply to the instant case. First, a settlement for $100,000 under 40:1299.44C(5) is an admission of liability for the original harm caused by the malpractice. The plaintiff is not required to prove a fact which is admitted. The exemption from proof of liability after settlement is a counterweight to the damage cap under the Act. Sewell v. Doctors *166 Hospital, 600 So.2d 577, 578 (La.1992). In general, a "tort" consists of causation-in-fact, duty, violation of the duty, and harm measured by damages. See Crowe, "The Anatomy of a Tort," 22 Loyola (La.) L.Rev. 903 (1976), and citations therein. Since the Act provides that after settlement the plaintiff may only prove damages arising from the malpractice, it is obvious that the fact of settlement forecloses any further consideration of cause-in-fact, duty, breach and harm.
In the instant case the district court committed legal error by allowing the Fund to relitigate the issues of causation and original harm. The Fund is simply not entitled to challenge the admission of liability for the original harm.
What was the original harm in this case? Here there is no petition setting forth the negligent acts and corresponding harm. Graham urges that the settlement admitted liability for every item on his LSU medical record since August 9, 1991, including the left foot amputation in late August 1991 and two heart attacks in May and June 1993. This position is untenable as the Fund specifically denied that all the asserted medicals were related to the malpractice. R. p. 15. The Fund urges in essence that it admitted only that Graham sustained the risk of undergoing a second anesthesia for a separate bypass surgery. This contention is patently unsound as Dr. Wright and his insurer would not conceivably have offered their policy limits for this fairly minor risk. It is also inconsistent with the entire focus of the discovery, pleadings and trial, all of which squarely addressed the loss of Graham's leg. After a close review of the entire record we conclude that the original harm, liability for which was admitted in the settlement, was the loss of Graham's leg. In our view, the settlement resolved the questions of cause-in-fact, duty, breach and original harm, admitting that Dr. Wright's negligent conduct, more probably than not, caused the loss of the leg. The district court was therefore wrong not to accept this, disregard the evidence of causation as it referred to the original harm, and set damages accordingly.[2] We will address the proper measure of this loss below.

Causation beyond the original harm
The second aspect of Jones, addressed by Graham in his third assignment, is the question of liability for damages beyond the original harm, including "his amputated left foot, his increased cardiovascular difficulties or the resulting disability[.]" As noted earlier, Jones holds that in order to recover damages for injuries beyond the original harm admitted in the settlement, the claimant must prove these elements of damage by the duty-risk analysis. Jones, 652 So.2d at 1335.
Although the district court did not elaborate on its denial of these losses, we are bound to review the evidence in the light which most favorably supports the judgment and to apply the manifest error rule. Theriot v. Allstate Ins. Co., 93-1823 (La. 10/28/93), 625 So.2d 1337; Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
In support of a causative link between Dr. Wright's malpractice and the ultimate amputation of part of the left foot, Graham cites the testimony of a nurse, Diana Watson, who called it a "complication" of his recovery. R. p. 246. However, Dr. Buechter testified that he thought Graham's left foot problems resulted from his underlying atherosclerosis. Dep., 70. A vascular consultation note of August 20, 1991 identified "arterial occlusive disease" as the source of the swelling, infection and necrosis in the left foot. Ex. P-3. On this evidence, we cannot say the district court was plainly wrong to deny recovery for the loss of part of Graham's left foot.
As for the subsequent heart attacks, Graham cites a portion of Dr. Smith's testimony in which she states that patients who have lost a leg have "increased energy requirements" in walking on crutches or with a prosthesis, and that this can shunt blood from the heart or increase the heart rate, *167 thus contributing to angina. Dep., 35. However, she did not think that this caused Graham's infarctions; they resulted from the same processes that caused his peripheral vascular disease. Id. Graham also testified that he uses crutches and his prosthesis only occasionally, and "mostly" stays in a wheelchair. R. p. 201. Graham reported to a doctor at LSU in 1979 that he had already sustained two strokes and two myocardial infarctions. Ex. D-3. A pathology report during his hospitalization for the gunshot wound found severe atherosclerosis. Ex. D-4. Given Graham's poor vascular condition, history of heart attacks and the equivocal nature of Dr. Smith's testimony, we cannot say the district court was plainly wrong to deny recovery for the subsequent heart attacks.

Quantum
By his third assignment Graham also urges the district court erred in failing to award the maximum damages available pursuant to the Act. He contends that his general damages exceed the cap of $500,000 in La.R.S. 40:1299.42 B(1), and requests special damages of $116,867.16, the total of all LSU medical bills from August 10, 1991 through July 2, 1993.
At the time of the injury Graham was a 60-year old man with advanced atherosclerosis and in fairly poor health. He had been on disability for 18 years. On this record he is not entitled to recover for lost wages or earning potential. Dollacker v. Schimek, 411 So.2d 643 (La.App. 4th Cir.), writ denied 413 So.2d 908 (1982).
Graham's hospital stay was obviously painful. He underwent a bypass operation, an amputation above the knee, and days later the hip disarticulation. The amputation sites kept getting infected and required frequent débridement. He reports phantom pains where the leg used to be. He testified that his early attempts to use a prosthesis aggravated a hernia.
Despite his health condition, Graham was fairly active before this incident. He enjoyed doing household chores and handyman work for "old folks"; he used to keep a beautiful garden. Now he cannot do these things. He has difficulty getting around, and mostly sits in a wheelchair or "scoots" on the floor. Because they are difficult to use, he uses crutches only on Sundays to attend church. He admitted that he can drive.
Several of the reported cases of leg amputations involved younger, healthier accident victims or those with additional serious injuries.[3] For guidance we turn to truly similar cases, Coco v. Winston Indus. Inc., 341 So.2d 332 (La.1977), bearing in mind that a court of appeal's initial award of damages is not limited to the lowest or highest that could be affirmed, but is to be a just amount based on the record. Rosell v. ESCO, supra; Beckham v. St. Paul Fire & Marine Ins. Co., 24,193 (La.App. 2d Cir. 2/24/93), 614 So.2d 760.
Our review discloses awards in the range of $200,000 to $300,000 for pain, suffering, disability and disfigurement from amputations above or below the knee which entailed infections and other complications. Walker v. Bankston, 571 So.2d 690 (La.App. 2d Cir. 1990); Allen v. State, 535 So.2d 903 (La.App. 2d Cir.), writ denied 536 So.2d 1201 (1988); Malone v. State Dept. of Health, 569 So.2d 1098 (La.App. 3d Cir.1990); Pitts v. Bailes, 551 So.2d 1363 (La.App. 3d Cir.1989), writs denied 553 So.2d 860, 556 So.2d 1262 (1990). It is noteworthy that Graham's amputation is above the hip joint, thus imparting a greater measure of disfigurement and ambulatory difficulties than in the other cases. He also underwent two amputation procedures with complications. On the record presented, we find an award of $400,000 is appropriate for this plaintiff's general damages.
Graham's claim for special damages includes LSU invoices not only for his original hospitalization in August through October 1991, but for additional confinements in 1993. The latter are for angina or heart attacks *168 which the district court found unrelated to the malpractice; this was not plainly wrong. A portion of the initial bill was for treatment of Graham's left foot, which the district court also rejected without manifest error. We will award the portion of the 1991 bills which is not directly attributed to the amputation of the left foot, or $69,414.46.
The total, $469,414.46, is subject to a reduction of $100,000 for the settlement with Dr. Wright's insurer. La.R.S. 40:1299.42 D(5); Thomas v. Insurance Corp. of Amer., 93-1856 (La. 2/28/94), 633 So.2d 136. Judgment will be rendered in favor of Graham and against the Fund for the balance, $369,414.46.

Conclusion
For the reasons expressed, the district court judgment is reversed and judgment is rendered herein in favor of the plaintiff, Melvin Graham, and against the defendant, Louisiana Patient's Compensation Fund, in the full sum of Three hundred, sixty-nine thousand, four hundred, fourteen dollars and.46/1.00 ($369,414.46) dollars, together with legal interest thereon from date of judicial demand until paid. Costs at the trial and appellate levels are assessed to the Fund. La.R.S. 40:1299.44 A(1); Koslowski v. Sanchez, supra.
REVERSED AND RENDERED.
BROWN, J., concurs in reversal, dissents in part.
BROWN, Judge, concurring in reversal, dissenting in part.
Clearly, the original harm occasioned by the admitted medical fault was the loss of Graham's leg. As stated in the majority opinion, the legal error of the trial court required reversal. I would add that the evidence also demonstrated clear error in the factual conclusion that the malpractice most probably did not cause Graham to lose his leg.
If Dr. Wright had called for a vascular surgeon after he first ligated the artery, that surgeon could have started the revascularization at 1:30 a.m. (four hours after the shooting). Defendant's expert, Dr. Hiller, a vascular surgeon, stated that he was on defendant's staff and, if on call, would have responded to such a request within twenty minutes. Dr. Wright understood that time was of the essence in restoring the blood flow to Graham's right leg. Instead, Dr. Wright's inaction caused a delay of about ten hours. Under these circumstances, it cannot be concluded that Dr. Wright's medical error was not significant.
Because of legal and factual error, the trial court did not address the questions concerning other conditions beyond the original harm. We are not bound by the manifestly erroneous/clearly wrong rule in our review of these claims. Our review is original and we should apply the duty-risk analysis. Jones, supra.
The revascularization or bypass on August 9th diverted part of the blood flow from Graham's left leg to his right leg. The following day, it was apparent that the procedure was not successful and gangrene was noticed in Graham's right leg, which was amputated above the knee. After further infection was found, the remainder of Graham's right leg was amputated above the hip joint on August 14th. Thereafter, within a week, gangrene was noticed in the toes of the left foot and the front part of that foot was also amputated.
It is axiomatic that a tortfeasor takes his victim as he finds him. In this case, Graham was 60 years old, diabetic and suffering from atherosclerosis which made him more prone to complications occasioned by the bypass or revascularization. I believe the amputation of the front of Graham's left foot was connected to the original harm. Thus, I would allow recovery for those medical expenses connected to the amputation of his left foot and an increased award for general damages. In this respect, I dissent from the majority opinion.
Before MARVIN, NORRIS, BROWN and WILLIAMS, JJ., and PRICE, J. Pro Tem.

ON MOTION FOR REHEARING
PER CURIAM.
The motion for rehearing is denied in part and granted in part. While an *169 error of law on the district court's part will deprive that court's factual findings of the great deference of the manifest error rule, Lasha v. Olin Corp., 625 So.2d 1002 (La. 1993), we find that even on de novo review the evidence does not prove by a preponderance that any of Mr. Graham's alleged "complications" after the leg amputation actually resulted from the act of malpractice. The malpractice was, of course, Dr. Wright's tragic delay in securing for Graham a fem-fem bypass that would likely have saved his right leg. However, even if this bypass had been performed promptly at 1:40 a.m., yielding an excellent chance of saving the right leg, it still would have entailed diverting part of the blood flow from Graham's left leg. R. p. 293. In other words, even a timely revascularization could have lessened the circulation to his left toes. The loss is not causally related to the malpractice. As for Graham's heart attacks, we find that Dr. Smith's testimony on this point establishes only a possibility, not a probability, that these resulted from the delayed bypass or the leg amputation. Dep., 33-34. This part of the motion for rehearing is DENIED.
Applicant also urges that interest on the judgment should begin to run from the date of the filing of the complaint with the board, or October 2, 1991. This is correct. The motion for rehearing is GRANTED to provide that legal interest shall run from October 2, 1991, in conformity with R.S. 40:1299.47M.
MOTION FOR REHEARING DENIED IN PART AND GRANTED IN PART.
NOTES
[1] The first document in the instant record is not a request for a Medical Review Panel, R.S. 40:1299.47 A(2), or a petition in suit alleging specific damages, but rather a petition to approve the proposed settlement. See La.R.S. 40:1299.44 C.
[2] For this reason we pretermit any discussion of Graham's second assignment of error, which contests the factual finding that Dr. Wright's conduct did not cost Graham a chance of saving the leg.
[3] See, e.g., Day v. South Line Equip. Co., 551 So.2d 774 (La.App. 1st Cir.), writ denied 553 So.2d 474 (1989); Simpson v. State through DOTD, 636 So.2d 608 (La.App. 1st Cir.1993), writs denied 637 So.2d 471, 472 (1994); Byrd v. Bossier Parish School Bd., 543 So.2d 35 (La.App. 2d Cir.), writ denied 550 So.2d 628 (1989).