759 So.2d 299 (2000)
Audrey Carolyn TURNER, et vir, Plaintiffs-Appellees
v.
Dr. Warren G. STASSI, Defendant-Appellant.
No. 33,022-CA.
Court of Appeal of Louisiana, Second Circuit.
May 10, 2000.
*301 Theus, Grisham, Davis & Leigh by David H. Nelson, Fred Williams Sartor, Jr., Monroe, Counsel for Appellant.
Richard L. Fewell, Jr., West Monroe, Counsel for Appellees.
Before STEWART, PEATROSS and DREW, JJ.
STEWART, J.
In this medical malpractice action, the defendant, Dr. Warren G. Stassi, appeals a judgment of the trial court awarding the plaintiffs, Audrey Carolyn Turner and Roy E. Turner, $120,000 in damages. Dr. Stassi challenges the merits of the trial court's finding that he failed to timely discover an injury of the spinal accessory nerve after treating Mrs. Turner for a deep neck abscess and the trial court's determination that the malpractice claim had not prescribed. We affirm.

FACTS
Mrs. Turner first sought treatment from Dr. Stassi, an otorhinolaryngologist or ear, nose, and throat ("ENT") specialist, on March 28, 1988 for a mass on the right side of her neck. Mrs. Turner had a sore throat and was concerned that she possibly contracted a strep infection from her son. Dr. Stassi began treatment with antibiotics. When he saw Mrs. Turner again on March 31, 1988, the mass appeared larger and Mrs. Turner's temperature was over 100 degrees. Dr. Stassi admitted Mrs. Turner to St. Francis Medical Center and began intravenous antibiotic treatment. After consultation with Dr. Edward Griffin, an internal medicine specialist, Dr. Stassi recommended a biopsy procedure. Dr. Stassi and Dr. Griffin believed the mass to be a lymphatic tumor, particularly Hodgkin's disease. Dr. Griffin's consultation report of April 2, 1988 shows that Mrs. Turner was having no focal, motor, sensory or cerebella defects and that cranial nerves IIXII were intact.
The biopsy procedure was performed on April 5, 1988. According to the operative report, Dr. Stassi opened the mass by making an incision over the posterior aspect of the mass through the skin and subcutaneous tissue. A copious amount of purulent material escaped and exuded from the mass. Dr. Stassi suctioned the *302 remainder of the pus from the wound. Using biopsy forceps, Dr. Stassi took several pieces of tissue from the surrounding nodal area for a pathological study. Dr. Stassi then placed a drain in the wound and closed with sutures. The post-operative diagnosis was a massive deep neck abscess. The pathology report indicated an acute and chronic inflammation and focal necrosis. The report did not indicate the presence of nerve tissues.
According to Mrs. Turner, she began to experience numbness in the area of her neck from her right ear lobe to the area of the surgical scar immediately after the procedure. In the following weeks, she began experiencing problems with her right shoulder, including pulling and pain. Mrs. Turner saw Dr. Stassi for five postoperative visits in April, May, and June of 1988. Although Mrs. Turner claimed that she related her concerns to Dr. Stassi and that he told her to "just give it time," his records are void of any notation regarding complaints by Mrs. Turner about her shoulder or neck.
On December 1, 1988, Mrs. Turner, who also suffered from severe rheumatoid arthritis, visited her orthopaedic surgeon, Dr. Douglas Brown. During this visit, Mrs. Turner complained of weakness of the right shoulder. Examination revealed right trapezius atrophy and a scar at the mid-cervical triangle from the procedure performed by Dr. Stassi. Dr. Brown's progress notes state a diagnosis of "right 11th cranial nerve neuropathy with secondary trapezial atrophy" and include a recommendation that Mrs. Turner return to Dr. Stassi to consider further treatment. The progress notes include a notation to copy to Dr. Stassi. Additionally, Dr. Brown recalled a brief conversation thereafter with Dr. Stassi regarding Mrs. Turner's complaints.
On December 23, 1988, Mrs. Turner returned to Dr. Stassi. According to Mrs. Turner, she told Dr. Stassi about the numbness and shoulder problem and asked if there was anything he could have done to cause the problem. Dr. Stassi answered "no" and did not examine her shoulder. Thereafter, Mrs. Turner saw Dr. Stassi on December 30, 1988; January 13, 23, and 30 of 1989; and August 10, 17, and 29 of 1989. None of Dr. Stassi's records from these eight visits refer to shoulder complaints by Mrs. Turner. Furthermore, Dr. Stassi claims that he never received any records regarding Mrs. Turner from Dr. Brown and never had a conversation with Dr. Brown about Mrs. Turner's shoulder complaints.
On February 7, 1991, Mrs. Turner again saw Dr. Brown. The progress notes from this visit indicate "atrophy of the right trapezius with winging of the scapula and weakness of the shoulder," recommend shoulder exercises and therapy, and note an appointment scheduled with Dr. Gulick, a neurologist. According to Mrs. Turner, she saw Dr. Brown to determine whether he could perform surgery on her shoulder that would enable her to regain use of it. Dr. Brown informed her that there was nothing he could do and explained that the nerve was damaged. Mrs. Turner then asked Dr. Brown whether Dr. Stassi damaged the nerve when he removed the abscess, and Dr. Brown replied "yes."
Mrs. Turner saw Dr. Thomas Gulick, an neurologist, on February 26, 1991. Dr. Gulick's records indicate that Mrs. Turner's right shoulder appeared consistently lower than her left shoulder and that there was decreased size of the right trapezius muscle consistent with atrophy of that muscle. Dr. Gulick also observed a "hollow" in the area where the collarbone joins the shoulder, but he did not observe winging as observed by Dr. Brown. Dr. Gulick believed that Mrs. Turner's injury involved the spinal accessory nerve, a nerve which operates the sternocleidomastoid muscle and the upper part of the trapezius muscle, and generally controls shrugging of the shoulders.
On April 2, 1991, Mrs. Turner filed a request for a Medical Review Panel *303 ("MRP") alleging that Dr. Stassi injured her during the procedure on April 5, 1988 and that, despite multiple inquiries about her problems, Dr. Stassi continued to assure her that there was no relationship between the procedure and the problems in the area of the surgical site. The MRP concluded that Dr. Stassi did not breach the standard of care in his performance of the biopsy procedure and that the procedure did not result in injury to Mrs. Turner's spinal accessory nerve. Mrs. Turner then filed the instant suit for damages.
In a thorough and well-reasoned opinion, the trial court concluded that while it was more probable than not that Dr. Stassi did injure Mrs. Turner's spinal accessory nerve during the biopsy procedure, such an injury did not constitute malpractice. Referring to expert testimony, including the testimony of the plaintiffs' own expert, Dr. Stephen E. Metzinger, that the spinal accessory nerve is routinely sacrificed in neck surgery involving cancerous masses, the trial court found that Dr. Stassi believed the mass on Mrs. Turner's neck to be cancerous and was therefore less careful than he otherwise might have been. However, the trial court did conclude that Dr. Stassi breached the standard of care in failing to diagnose Mrs. Turner's post-operative condition and assist in the management of her problems, and in failing to act upon information received from Dr. Brown regarding Mrs. Turner's shoulder complaints. The trial court further found that, had Dr. Stassi acted to assist Mrs. Turner, both surgery or physical therapy could have aided her in achieving a better result than she experienced, and that early intervention could have improved her medical condition. The trial court also denied a motion for a new trial filed by Dr. Stassi.
Following the trial court's adverse judgment, Dr. Stassi appealed and set forth three assignments of error for review. In his assignments of error, Dr. Stassi asserted that the trial court erred in the following respects:
1. Finding that Dr. Stassi failed to timely discover an injury to Mrs. Turner's spinal accessory nerve;
2. Finding causation between the failure of Dr. Stassi to detect the injury to the spinal accessory nerve and any physical problems Mrs. Turner may have as a result this; and
3. Failing to grant Dr. Stassi a new trial restricted to the issue of the timely discovery of the injury to the spinal accessory nerve and what injuries, if any, were sustained by Mrs. Turner by virtue of his failure to be aware of the problem.
While the matter was pending on appeal, Dr. Stassi, for the first time, raised the peremptory exception of prescription. This court, without addressing the issues on appeal, remanded the matter to the trial court for consideration of the exception, including any additional evidence pertinent to the prescription issue. On remand, the trial court overruled the exception upon finding that Mrs. Turner did not have enough information to realize that she had a malpractice claim until February 1991. An appeal by Dr. Stassi followed in which he reiterated his original assignments of error and also assigned as error the trial court's failure to find Mrs. Turner's claims prescribed.

DISCUSSION

Finding of Malpractice:
Dr. Stassi's first two assignments of error pertain to the trial court's finding that he breached the standard of care by failing to timely discover Mrs. Turner's spinal accessory nerve injury and that this breach caused injury to Mrs. Turner. The principle arguments asserted by Dr. Stassi are that the evidence does not support a finding that he had notice of Mrs. Turner's shoulder problems or possible nerve injury, and that Mrs. Turner failed to prove that, had he detected the problem within a reasonable time, there would have been an opportunity to correct it and that this opportunity *304 was lost because of the passage of time.
As provided in La. R.S. 9:2794(A), the plaintiff in a medical malpractice action has the burden of proving, by a preponderance of the evidence:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical malpractice raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
In brief, the plaintiff is required to prove the applicable standard of care, the physician's violation of the standard of care, and the causal connection between the physician's alleged negligence and the plaintiff's injuries. Lugenbuhl v. Dowling, 96-1575 (La.10/10/97), 701 So.2d 447; Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94), 643 So.2d 1228; Pugh v. Beach, 31,361 (La.App.2d Cir.12/11/98), 722 So.2d 442. Resolution of these inquiries are determinations of fact which should not be reversed on appeal absent manifest error. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991). It is the reviewing court's duty to consider the evidence in its entirety, not merely that portion of the record that will support or undermine the trial court's judgment. Rowsey v. Jones, 26,823 (La.App.2d Cir.5/10/95), 655 So.2d 560.
The record establishes the applicable standard of care, and Dr. Stassi does not dispute this determination by the trial court. The applicable standard of care requires a physician to look for known complications of medical procedures, to take notice of and act upon patient information related by other physicians, and to assist patients in the management of postoperative medical problems. However, Dr. Stassi does take issue with the trial court's finding that he breached this standard of care and that a causal connection exists between the breach and Mrs. Turner's injury.
Mrs. Turner testified that she complained to Dr. Stassi about the numbness on the morning after the surgery and during her subsequent visits. However, Dr. Stassi did not examine her; rather, he simply advised her to "just give it time." When she saw Dr. Brown on December 1, 1988, he noted the presence of right trapezius atrophy and a cervical scar. Dr. Brown advised Mrs. Turner to seek further treatment from Dr. Stassi, since her problem appeared to involve the neck area and he believed this to be in Dr. Stassi's area of expertise. Dr. Brown also made a notation on his record to have Mrs. Turner's information copied to Dr. Stassi. Dr. Stassi denied receiving any information from Dr. Brown about Mrs. Turner. However, Dr. Brown recalled that he also spoke briefly with Dr. Stassi about Mrs. Turner's condition.
Mrs. Turner testified that when she again saw Dr. Stassi on December 23, 1988, she asked about the numbness and drawing of her right shoulder and whether it could have been caused by the biopsy procedure. According to Mrs. Turner, Dr. Stassi simply replied "no," conducted no examination, and made no recommendations for treatment. He also ignored her concerns about her shoulder during subsequent visits. Dr. Stassi, however, denied *305 that Mrs. Turner voiced complaints about her shoulder or neck to him and testified that she experienced only the normal post-operative pain. He insisted that he had no notice of Mrs. Turner's complaints and referred to his records of Mrs. Turner's visits, which include no mention of such complaints. Dr. Stassi explained that a nurse is present whenever he interviews a patient and that the nurse takes notes of the patient's complaints. He then reviews the notes and makes any needed additions. However, Mrs. Turner denied that a nurse was present during her interviews with Dr. Stassi. She testified that the nurse would leave the examination room once Dr. Stassi entered.
Dr. Stassi also testified that he would not have had the occasion to simply notice the atrophy of Mrs. Turner's shoulder, since his examination of her concerned problems involving the ear, nose, and throat and did not involve any examination from a muscular standpoint. However, Dr. Lawrence J. Danna, an ENT specialist and member of the MRP, testified at trial that Mrs. Turner's atrophy of the trapezius muscle was observable. Dr. Danna also testified that the muscle disuse due to atrophy would be observable to an ENT specialist after close to a year post-surgery. However, Dr. Lauren Mickey, also an ENT specialist and member of the MRP, testified that Mrs. Turner's shoulder problem would not be immediately apparent during an examination conducted by an ENT specialist and that she has only observed such problems when the patient specifically complained about it. It was evident from Dr. Mickey's testimony that she believed that Mrs. Turner made no complaints regarding her shoulder problems to Dr. Stassi and that Dr. Brown did not relay information about Mrs. Turner to Dr. Stassi in a meaningful way.
Finally, the plaintiffs' expert, Dr. Metzinger, testified that Mrs. Turner had an obvious complication from the biopsy procedure involving numbness in the area where the procedure was performed, atrophy, and the inability to move her right shoulder freely. Dr. Metzinger believed that the spinal accessory nerve injury was an iatrogenic injury, one unintentionally caused by a physician's medical treatment. Dr. Metzinger testified that it was certainly below the standard of care for Dr. Stassi to ignore Mrs. Turner's obvious complication from the procedure and her complaints of pain and numbness during the course of his treatment of her. Additionally, Dr. Metzinger testified that it was below the standard of care for Dr. Stassi to fail to act upon information conveyed by Dr. Brown.
As is evident from the above summary, the trial court was faced with conflicting testimony. Resolution of the dispute required credibility determinations by the trial court. Credibility determinations in medical malpractice actions, including the evaluation of expert testimony, together with the ultimate issue of whether the plaintiff satisfied the burden of proof, are to be resolved by the trier of fact and will not be disturbed on appeal in the absence of manifest error. Roberts v. Cox, 28,094 (La.App.2d Cir.2/28/96), 669 So.2d 633; Iseah v. E.A. Conway Memorial Hospital, 591 So.2d 767 (La.App. 2d Cir.1991). Where there are contradictory expert opinions regarding compliance with the standard of care, the reviewing court is bound to give great deference to the conclusions of the trier of fact. Pinnick v. Louisiana State University Medical Center, 30,263 (La.App.2d Cir.2/25/98), 707 So.2d 1050.
The trial court found that the expert testimony established that nerve injury, such as that experienced by Mrs. Turner, is a known complication of the disease process and can be considered an iatrogenic injury. The injury is observable, and it would be below the standard of care for a physician to fail to address the problem once brought to his attention. The trial court also found that Dr. Stassi had notice of Mrs. Turner's injury. During the numerous occasions on which Dr. Stassi *306 treated Mrs. Turner for other ailments, including complaints of sore throat and both neck and right temporomandibular pain, Dr. Stassi should have taken notice of the atrophying condition of Mrs. Turner's shoulder muscle. Furthermore, the trial court made a credibility determination and chose to accept the testimony of Dr. Brown. The trial court believed that Dr. Brown spoke to Dr. Stassi about Mrs. Turner's condition, and possibly forwarded information to him. Dr. Brown gave Dr. Stassi the opportunity to address Mrs. Turner's problem, but Dr. Stassi took no action to do so. We find no manifest error in these findings by the trial court as to Dr. Stassi's breach of the standard of care.
The next issue presented is that of causation. The trial court determined that the infliction of the spinal accessory nerve injury was not a breach of the standard of care. Consequently, Mrs. Turner had to prove the additional injury she incurred as a result of Dr. Stassi's failure to detect and address the nerve injury.
The trial court's finding as to the causation issue was that either surgery or physical therapy could have aided Mrs. Turner in achieving a better result than she experienced. In making this finding, the trial court primarily relied upon the testimony of Dr. Metzinger, who testified that early intervention and treatment could have improved Mrs. Turner's condition and whose testimony the trial court found to be credible. Dr. Dana also testified that the likelihood of repair to the nerve is better if the problem is addressed early. While Dr. Mickey testified that she would not have recommended surgery for the type of nerve injury incurred by Mrs. Turner, she would have at least recommended physical therapy which would enable the patient to get other muscles in the affected area to "take up the slack" for the muscles that can no longer function properly.
Because Dr. Stassi failed to detect and address Mrs. Turner's spinal accessory nerve injury, she has suffered severe and debilitating atrophy of the right trapezius muscle. This disability is even more devastating since Mrs. Turner also suffers from severe rheumatoid arthritis. While Mrs. Turner may not have obtained full function of the nerve or full use of the affected muscle from early intervention, any improvement would have been of benefit in light of her overall medical condition. The claimant in a medical malpractice action need not show that a perfect result would have been retained in the absence of malpractice; rather, the claimant may recover by showing that the health care provider's negligence denied the chance of a good outcome. Graham v. Willis-Knighton Medical Center, 27,338 (La.App.2d Cir.9/29/95), 662 So.2d 161, remanded, 95-2881 (La.11/25/96), 683 So.2d 1219, judgment reinstated on remand, 27,338 (La.App.2d Cir.12/20/96), 686 So.2d 955, writ granted, 97-0188 (La.3/21/97), 691 So.2d 69, judgment amended, and otherwise affirmed, 97-0188 (La.9/9/97), 699 So.2d 365. Additionally, causation is a factual finding which should not be reversed on appeal absent manifest error. Martin v. East Jefferson General Hospital, supra.
Our review of the record shows no manifest error in the trial court's finding of causation between Dr. Stassi's failure to detect and address the spinal accessory nerve injury and Mrs. Turner's physical problems therefrom. Dr. Stassi's first two assignments of error lack merit.

Failure to Grant a New Trial:
In his third assignment of error, Dr. Stassi contends that the trial court erred in denying his motion for a new trial as to whether he breached the standard of care by failing to detect and address the spinal accessory nerve injury and whether Mrs. Turner sustained any injury by virtue of this alleged breach. Dr. Stassi asserts that the MRP did not address these issues and that the defense did not have an adequate opportunity to prepare to address these issues at trial. The basis of Dr. Stassi's complaint is that the plaintiffs, in *307 violation of the pre-trial order, injected the testimony of a "last minute" expert, Dr. Metzinger.
A joint pre-trial statement filed April 3, 1996, shows that the plaintiffs listed a "medical expert" among their named witnesses. This expert was not named. The pre-trial order of the same date required the parties to identify experts and exchange reports by June 14, 1996. At the start of the trial on July 22, 1996, the defense objected to the introduction of Dr. Metzinger's deposition. It appears from reviewing this exchange regarding the defense's objection that the plaintiffs' initial expert witness fell through. The plaintiffs then secured the services of Dr. Metzinger as a last minute substitute. A report generated by Dr. Metzinger was not forwarded to defense counsel. Consequently, defense counsel was unable to prepare for the deposition of Dr. Metzinger, did not participate in the deposition, and objected to the introduction of the deposition or any testimony by Dr. Metzinger at trial. The trial court granted the objection and refused to allow the introduction of Dr. Metzinger's deposition into evidence, since the defense was unable to participate in the deposition. Cognizant of the defense's objection to any continuance of the trial, the trial court then attempted to fashion a remedy which would be fair to both parties. The trial court, with the input of both parties, decided to go ahead with the trial. At the close of trial, rather than rendering a judgment, the trial court permitted the plaintiffs, with the participation of the defense, to again depose Dr. Metzinger. Thereafter, the defense was allowed to depose its own expert or other witnesses in rebuttal to Dr. Metzinger's testimony, all at the plaintiffs' cost. The trial court then considered this additional evidence in rendering its judgment.
The trial court is granted broad discretion in conducting a trial and in determining whether to receive or refuse testimony. Ware v. Medical Protective Ins. Co., 621 So.2d 54 (La.App. 2d Cir. 1993). Also, pursuant to La. C.C.P. art. 1551, the trial court has much discretion in implementing its pre-trial order to allow modifications that prevent substantial injustice. Id. We do not find that the trial court's decision to hold the record open to allow the parties to depose Dr. Metzinger and rebuttal witnesses on behalf of the defense was an abuse of its broad discretion.
Also, we do not find merit in Dr. Stassi's contention that the defense did not have adequate time to prepare for the issues of his failure to detect and address Mrs. Turner's problems and of causation of any injuries from this alleged breach of the standard of care. The request for the MRP, the petition for damages, and the joint pre-trial statement all include the allegation that despite multiple inquiries by Mrs. Turner about her problems, Dr. Stassi assured her on numerous occasions that there was no relationship between the procedure he performed and the subsequent manifestation of numbness and weakness in areas collateral to the surgical site. Surely, this allegation is sufficient to have put the defense on notice that Dr. Stassi's failure to address Mrs. Turner's complaints would be a potential issue at trial.
We find no merit in this assignment of error.

Prescription:
In his fourth assignment of error, Dr. Stassi asserts that the trial court erred in failing to find Mrs. Turner's claim prescribed. According to Dr. Stassi, Mrs. Turner admitted in her testimony that she learned from Dr. Brown on December 1, 1988 that Dr. Stassi caused her injury during the biopsy procedure. We do not read Mrs. Turner's testimony as including such an admission.
According to Mrs. Turner's testimony, she mentioned her neck and shoulder pain to Dr. Brown as an afterthought during her December 1, 1988 office visit. Dr. *308 Brown examined her, noticed the biopsy scar, and advised her, since he was not an expert on necks, to go back to Dr. Stassi to determine whether there could be a relation between the two. Mrs. Turner did not testify that Dr. Brown informed her during this visit that Dr. Stassi damaged her nerve during the biopsy procedure. During the defense's cross-examination of Mrs. Turner, the following exchange occurred:
Q. Did Dr. Brown ever tell you that Dr. Stassi cut the nerve?
A. Yes, sir, he did.
Q. Well, tell us about that.
A. He didn't say cut. He said damaged. That was in February of '91 the last time that I saw Dr. Brown ... And he said wheneversomething about the nerve being damaged. And I said wait just a minute. I said you mean to tell me that when Dr. Stassi opened the abscess on that gland he damaged the nerve. He said yes.
By The Court: Just a minute, Judge Davis. What was the date of that visit?
A. That was in February of '91.
By the Court: I'm sorry, Mr. Davis. You may proceed.
Q. And that's when he then told you that Dr. Stassiyou're words to me was you quoted him as saying "you mean to tell that when Dr. Stassi opened the abscess on my neck, he damaged the nerve and that is the reason for all my problems." That's what he told you?
A. Yes, sir.
It is clear from Mrs. Turner's testimony that she did not learn that Dr. Stassi possibly damaged her spinal accessory nerve until her February 1991 visit with Dr. Brown. Prior to this visit, she had only been advised by Dr. Brown to discuss her problems with Dr. Stassi, and she had done as advised. Dr. Stassi denied any relationship between the biopsy procedure and her complaints and did nothing to assist her in managing her post-operative condition. However, Dr. Stassi did continue to treat her for other unrelated problems, all the while failing to detect her deteriorating shoulder condition.
La. R.S. 9:5628 provides in pertinent part:
A. No action for damages for injury or death against any physician ...,whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.
Constructive knowledge sufficient to begin the running of prescription requires more than a mere apprehension that something might be wrong. Griffin v. Kinberger, 507 So.2d 821 (La.1987); Bossier v. Ramos, 29,766 (La.App.2d Cir.8/20/97), 698 So.2d 711; Harlan v. Roberts, 565 So.2d 482 (La.App. 2d Cir.1990). Prescription does not run against one who is ignorant of the fact upon which his cause of action is based so long as such ignorance is not willful, negligent, or unreasonable. Thus, even if a malpractice victim is aware that an undesirable condition has developed after the medical treatment, prescription will not run as long as it was reasonable for the plaintiff not to recognize that the condition might be related to the treatment. Griffin v. Kinberger, supra; Harlan v. Roberts, supra.
Each case must be decided on its own peculiar facts. The court may take into consideration such factors as the patient's educational background, intelligence, and past experience with medical procedures in assessing whether or not he had knowledge of possible malpractice. Harlan v. Roberts, supra.
Under the peculiar facts of this case, we find that Mrs. Turner did not have notice of sufficient facts to begin the running of prescription until her February 1, 1991 *309 visit with Dr. Brown at which she learned that Dr. Stassi may have injured her nerve during the biopsy procedure. Prior to this time, she had been advised to seek treatment for her problems from Dr. Stassi. Dr. Stassi continued to treat Mrs. Turner for unrelated complaints, all the while ignoring her shoulder and neck complaints after informing her that there was no connection between these symptoms and the biopsy procedure. Considering the other physical ailments from which Mrs. Turner suffered, it would not be unreasonable for her to accept Dr. Stassi's answer to her inquiry and believe that her shoulder problems were not related to the biopsy procedure. As such, the request for the MRP filed April 2, 1991, within one year of discovering that she may have a malpractice claim and within three years of the biopsy procedure performed by Dr. Stassi and her subsequent visits with him, was timely.
We find no merit in this assignment of error.

CONCLUSION
For the reasons just discussed, we affirm the trial court's judgment at appellant's cost.
AFFIRMED.