675 So.2d 720 (1996)
Marcia Thomas PENDLETON
v.
Robert L. BARRETT, et al.
No. 95-CC-2066.
Supreme Court of Louisiana.
May 31, 1996.
Rehearing Denied June 28, 1996.
*721 Troy E. Bain, for Applicant.
Milo Addison Nickel, Woodley, Williams, Fenet, Boudreau, Norman & Brown; Jack O. Brittain, Michele S. Caballero, for Respondent.
John Layne Hammons, for John L. Hammons amicus curiae.
Lawrence S. Killman, John Layne Hammons, for Louisiana Trial Lawyers Association amicus curiae.
Anthony Christopher Robinson, for Office of Risk Management amicus curiae.
Michelle Anne Bourque, for Tulane University Medical Center and Administrators of Tulane Education Fund amicus curiae.
Cristina Romig Wheat, for Ochsner Foundation Hospital amicus curiae.
CALOGERO, Chief Justice.[*]
This case requires interpretation and application of La.R.S. 40:1299.44(C)(5), the provision of the Louisiana Medical Malpractice Act having to do with the Patient's Compensation Fund's excess exposure. In the event a medical malpractice plaintiff is paid $100,000 by a self-insured qualified health care provider, or the $100,000 policy limits by the insurer of a qualified health care provider, and then seeks additional compensation from the Patient's Compensation Fund, this statutory provision gives the district court the authority to decide the amount of damages to be paid to the medical malpractice plaintiff out of the Patient's Compensation Fund. In particular, La.R.S. 40:1299.44(C)(5) states in pertinent part, emphasis added:
The court shall determine the amount for which the fund is liable and render a finding and judgment accordingly. In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund, the court shall consider the liability of the health care provider as admitted and established where the insurer has paid its policy limits of one hundred thousand dollars, or where the self-insured health care provider has paid one hundred thousand dollars.
The particular question before us today, in light of the statute's provision that the district court shall, upon payment of the $100,000, consider the liability of the health care provider as admitted and established, is whether this statute requires a district court to determine medical causation in assessing the amount of damages to be paid from the Patient's Compensation Fund.
Our conclusion is that in these circumstances, the liability of the health care provider is admitted and established as to the original harm emanating from the alleged malpractice. No further proof of causation is required to establish liability for this original harm. The district court's sole function is to calculate and assess damages. However, with regard to alleged secondary harm, that is, all other alleged damages which are not primary, the plaintiff bears the burden of proving that they were caused by the medical malpractice. Thus, the district court must engage in a duty-risk analysis (with the burden of proof on plaintiff) to determine whether the alleged malpractice was the cause of the secondary harm.

*722 FACTS[1]
According to the Petition, upon noticing a lump in her right breast in March, 1979, Marcia Thomas Pendleton consulted Dr. James Vernon Kaufman, a surgeon in Natchitoches, Louisiana. Pendleton had a family history of breast cancer. Dr. Kaufman did a mammogram and told Pendleton that it was negative. However, the lump continued to grow, and on April 16, 1979, Dr. Kaufman recommended a biopsy of the lump for testing by a pathologist. The biopsy was performed on April 17, 1979 at Natchitoches Parish Hospital. Pendleton was informed that the biopsy was negative for malignancy.
The lump still continued to grow, and on May 29, 1979, Dr. Kaufman recommended surgical removal. The lump was a tumor which was removed by Dr. Kaufman on June 1, 1979, and pathology tests showed the tumor to be malignant. On June 2, 1979, Pendleton was transferred to Schumpert Hospital in Shreveport to be treated by Dr. Robert L. Barrett who performed a modified radical mastectomy on June 7, 1979. The tissue was found to be malignant, and Pendleton was discharged from the hospital.
Several days later, Pendleton began experiencing pain in her right thigh which eventually spread to her right hip, groin and back. She told Dr. Barrett about the growing pain, and she also consulted Dr. Kaufman throughout September, 1979. In an attempt to alleviate the pain, Pendleton also consulted an orthopedic surgeon and a neurosurgeon. In November, 1979, she was referred to Ochsner Clinic in New Orleans. Diagnostic tests at that time revealed tumors of the right thigh, right hip, a vertebra, the skull and possibly the liver. Chemotherapy was immediately begun at M.D. Anderson Hospital in Houston, Texas and continued for several months.

PROCEDURAL HISTORY
In May, 1980, Pendleton filed suit in the Tenth Judicial District against Dr. James Kaufman and Dr. Robert L. Barrett, alleging the following negligent acts on the part of Dr. Kaufman:
(a) Failure to diagnose the malignant tumor prior to the surgery of June 1, 1979;
(b) Failure to use more diagnostic tests to aid in diagnosing the malignant tumor prior to June 1, 1979;
(c) Failure to refer petitioner to a major cancer treatment center prior to June 1, 1979;
(d) Failure to perform a biopsy prior to April 17, 1979;
(e) Failure to take an adequate specimen when the biopsy was performed on April 17, 1979;
(f) Failure to remove the tumor on April 17, 1979;
(g) Failure to run estrogen receptor tests on the tumor specimen on June 1, 1979;
(h) Failure to diagnose that the tumor had metastasized during the treatment period from September 4, 1979 to October 22, 1979;
(i) Failure to run more diagnostic tests after September 4, 1979 to see if the tumor had metastasized; and
(j) Failure to refer petitioner to a major cancer treatment center after he knew or should have known that the malignancy had metastasized.
The following negligent acts were alleged against defendant Dr. Barrett:
(a) Failure to perform an estrogen receptor test on the tumor specimen removed on June 7, 1979;
(b) Failure on June 2 or June 3, 1979 to request that an estrogen receptor test be run on the tumor specimen removed on June 1, 1979;
(c) Failure to refer petitioner to a major cancer treatment center after the surgery of June 7, 1979;

*723 (d) Failure to diagnose that the tumor had metastasized during the treatment period after June 18, 1979;
(e) Failure to run more diagnostic tests after June 18, 1979 to see if the tumor had metastasized; and
(f) Failure to refer petitioner to a major cancer treatment center after he knew or should have known that the malignancy had metastasized.
Pendleton also alleged that but for the negligence of defendants, she would have suffered much less pain and would have been disabled for a shorter period of time. Further, defendants' negligence lessened her life expectancy.
Pendleton died on June 18, 1981, approximately a year after filing the original petition. A First Supplemental and Amended Petition was filed substituting as plaintiff Pendleton's husband, D. William Pendleton, individually and as tutor for their minor child Lindsay Renee Pendleton. Named as defendants were Dr. Barrett, his insurer Hartford Accident and Indemnity Company, Dr. Kaufman, and his insurer St. Paul Fire & Marine Insurance Company. The Supplemental Petition alleged that Pendleton continued to suffer with increasing pain, and in February, 1981, additional malignancies were found in her lung and in her brain. During the last months of her life, she suffered increasing pain and mental anguish caused by the increasing certainty of death. She allegedly died as a direct result of the malignancies that originated from the original breast cancer.
Trial began in March, 1993. After several days of trial, the parties informed the district court that they had reached a settlement. A "Joint Petition for Court Approval of the Settlement of a Medical Malpractice Claim and the Demand for Payment of Damages from the PCF" was filed in compliance with the Louisiana Medical Malpractice Act. In this pleading, the parties asked the district court to approve plaintiff's settlement with Dr. Robert L. Barrett, M.D. and his insurer Hartford as Dr. Barrett was a qualified health care provider within the terms of the Act. Plaintiff also reserved his rights to proceed against the PCF and sought damages in excess of the $100,000. Plaintiff also settled his claims against Dr. Kaufman, who was not covered by the Medical Malpractice Act, and his insurer. The district court approved the settlement.
The PCF rejected plaintiff's claim for excess damages, and after numerous pre-trial motions, trial was scheduled to begin July 17, 1995. Prior to trial, the PCF raised several issues which it sought to have resolved prior to trial. In particular, the PCF asked the district court to answer prior to trial the following questions on the parties' burdens regarding causation:
Do damages include causation, so plaintiff will be required to prove what damages were caused by the fault of Dr. Barrett that was statutorily admitted?
Does liability include causation, so plaintiff is not required to prove what damages were caused by the statutorily admitted fault of Dr. Barrett?[2]
Defendant PCF took the position that plaintiff had the burden at trial to prove what damages were caused by the physician's fault and the degree and seriousness of those damages. To this end, PCF sought to take further depositions and additional discovery. In response, plaintiff contended that under La.R.S. 40:1299.44(C)(5), liability, including causation, was admitted and established by the $100,000 payment and hence, the only remaining issue to be tried was the amount of damages. Additional discovery was unnecessary.
The district court agreed with plaintiff, first concluding that the PCF is not a party defendant in an action under the Medical Malpractice Act, but rather has the status of a statutory intervenor. As an intervenor, the PCF must take the proceedings as it finds them, including the status of discovery. The district court further concluded that under La.R.S. 40:1299.44(C)(5), the payment by Dr. Barrett of $100,000 triggered the court's obligation to "consider the liability of a health care provider as admitted and established." La.R.S. 40:1299.44(C)(5). The court cited *724 Rodriguez v. Louisiana Medical Mutual Insurance, 620 So.2d 335 (La.App. 5th Cir. 1993) in support, where the Louisiana Fifth Circuit Court of Appeal cited several Louisiana Supreme Court cases and concluded that where there is a $100,000 settlement by a qualified health care provider, the PCF is foreclosed from contesting causation or liability and is entitled only to appeal the amount of damages owed. The district court thus entered a Judgment dated June 15, 1995 that since Dr. Barrett settled with plaintiff for the amount of $100,000 and plaintiff reserved his rights against the PCF, no evidence regarding a causal connection between the admitted fault of Dr. Barrett and the injuries and damages suffered by the late Mrs. Pendleton would be required at trial. Further, the only evidence which would be permitted would be evidence to establish the monetary amount of the damages. The taking of additional discovery depositions would not be permitted.[3]
The Third Circuit Court of Appeal granted the PCF's writ application in part, denied it in part and made it peremptory. In a one-paragraph statement, the three-judge panel found that the district court had not erred in prohibiting further discovery. However,
... a plaintiff in a medical malpractice suit has the burden of presenting evidence to determine what damages were caused by the health care provider's admitted liability and determine what amount, if any, is to be paid from the Patient's Compensation Fund. The trial court erred in ruling that no evidence regarding causal connection between the admitted liability and the damages alleged would be required at trial.
No authority was cited in support of this conclusion.
We granted plaintiff's writ application to resolve the matter of the proper interpretation of La.R.S. 40:1299.44(C)(5) and the phrase "the court shall consider the liability of the health care provider as admitted and established ..." As will be discussed below, the courts of appeal are in conflict on whether this phrase requires or precludes the introduction of evidence on causation in proving the amount of damages owed by the PCF.

LOUISIANA MEDICAL MALPRACTICE ACT
The section of the statute at issue today, La.R.S. 40:1299.44(C)(5), is part of the broader Louisiana Medical Malpractice Act which was enacted in 1975 in response to a perceived crisis in the delivery of health care, "ostensibly prompted by the prohibitive costs associated with medical malpractice insurance." Thomas v. Insurance Corporation of America, 93-1856 (La. 2/28/94); 633 So.2d 136, quoting Everett v. Goldman, 359 So.2d 1256, 1261 (La.1978). In an attempt to reduce medical malpractice insurance costs, the Act imposes a scheme under which claims against health care providers who are qualified in accordance with La.R.S. 40:1299.42(A) are first submitted to a medical review panel. Further, the Act limits the amount of recovery by any one patient for medical malpractice against a qualified health care provider to $100,000. Damages for medical malpractice damages in excess of $100,000 up to a limit of $500,000, exclusive of future medical care and related benefits, can be recovered from the PCF. La.R.S. 40:1299.42.[4]
La.R.S. 40:1299.44 outlines the creation, powers and obligations of the PCF, which is funded by collections of an annual surcharge from qualified health care providers. La. R.S. 40:1299.44(C) delineates the procedure for collecting from the Fund in the event a malpractice plaintiff has been paid $100,000 from the health care provider or his insurer, yet the claimant demands an amount in excess of the settlement. The claimant files a petition in court seeking approval of the agreed settlement and the court's entertaining his demand for additional damages from the PCF. A copy of the petition is served on the PCF Oversight Board, the health care *725 provider and his or her insurer at least ten days before the filing of the petition. La. R.S. 40:1299.44(C)(2). The Board may agree to the demand or file objections within twenty days after the petition is filed. La.R.S. 40:1299.44(C)(3). The district court shall set a hearing date on the claimant's petition. La.R.S. 40:1299.44(C)(4).
La.R.S. 40:1299.44(C)(5) provides the procedure for the district court to follow in approving a settlement.[5] If there is no agreement between the parties on the amount of excess damages to be paid by the Fund, the court has the responsibility to determine the amount of such damages. In approving a settlement or in determining the amount to be paid from the Fund in a case where the qualified health care provider's insurer has tendered $100,000 in settlement to claimant, then the court "shall consider the liability of the health care provider as admitted and established ...".[6]
La.R.S. 40:1299.44(C)(7) imposes a requirement of good faith and reasonable care upon the insurer of the health care provider in considering and acting upon settlement. The Patient's Compensation Fund Oversight Board is created under the terms of La.R.S. 40:1299.44(D) and is specifically empowered with numerous duties.
The Medical Malpractice Act's limitations on the liability of a health care provider constitute special legislation in derogation of the rights of tort victims, and as such, the coverage of the Act should be strictly construed. Sewell v. Doctors Hospital, 600 So.2d 577 (La.1992). Because the statute grants immunities or advantages to a special class in derogation of general rights, it must be strictly construed against limiting the tort claimant's rights against the wrongdoer. Branch v. Willis-Knighton Medical Center, 92-3086 (La. 4/28/94); 636 So.2d 211; Kelty v. Brumfield, 93-1142 (La. 2/25/94); 633 So.2d 1210; and Williams v. St. Paul Ins. Cos., 419 So.2d 1302 (La.App. 4th Cir.1982). Keeping this in mind, we turn to consideration of La.R.S. 40:1299.44(C)(5) and whether its admission of liability clause satisfies the plaintiff's burden of proving a causal connection between the acts of malpractice and corresponding injuries and damages.

La.R.S. 40:1299.44(C)(5)
This Court has addressed the implications of La.R.S. 40:1299.44(C)(5) in previous cases. In Koslowski v. Sanchez, 576 So.2d 470 (La.1991), the issue was whether plaintiff had reached the requisite settlement under the Medical Malpractice Act to trigger access to the PCF because plaintiff only received $93,500 after costs of jury and medical review panel were deducted from plaintiff's recovery.[7] In resolving that issue, we clarified that the PCF is not a party defendant under the Act, but rather has the status of a third party with an interest in the proceedings, such as an intervenor. On the issue of admitted liability under the Act, we stated at 576 So.2d at 474, with emphasis added:

*726 Liability under the Medical Malpractice Act is based on the initial $100,000 paid by the health care provider or its insurer, pursuant to judgment, settlement or arbitration. When the insurer has admitted liability up to the statutory maximum the liability of the health care provider is established, and the only remaining issue is the damages, if any, owed by the patient's compensation fund. The fund cannot contest liability when there is a binding settlement for $100,000 by the health care provider, either before or after trial.
In a concurring opinion in Koslowski, Justice Lemmon reiterated that once $100,000 is paid by or on behalf of a health care provider at any time, the health care provider's liability is no longer at issue. Justice Lemmon opined that this is so because the Legislature attempted to balance the competing interests of medical malpractice victims against the interests of health care providers, and decided as a policy matter that a payment of $100,000 is significant enough to foreclose further litigation of liability: "[t]he only issue remaining thereafter between the tort victim and the Patient's Compensation Fund is the amount of damages." 576 So.2d at 474.
In Stuka v. Fleming, 561 So.2d 1371 (La. 1990), we held that where $100,000 was paid to a medical malpractice victim by one qualified health care provider, the admission of liability provision of La.R.S. 40:1299.44(C)(5) was triggered, and the only remaining issue between the victim and the PCF was the amount of the victim's damages in excess of the amount already paid. Because of this admission of liability which binds the PCF, it is clear that the legislative intent underlying La.R.S. 40:1299.44(C)(5) was to afford the PCF fewer rights when claims against multiple health care providers are settled than when they are tried. See our recent case of Thomas v. Insurance Corporation of America, 93-1856 (La. 2/28/94); 633 So.2d 136, 139. Of special relevance to the issue herein is our comment in Stuka that "[p]ayment by one health care provider of the maximum amount of his liability statutorily establishes that the plaintiff is a victim of that health care provider's malpractice." 561 So.2d at 1374.
Stuka was cited with approval in Russo v. Vasquez, supra, where we stated, emphasis added:
Recognizing that La.R.S. 40:1299.44(C)(5) did not make any express provisions for a case in which multiple health care providers have been joined as defendants and where only one of the defendants pays the $100,000 in settlement, we interpreted R.S. 40:1299.44(C)(5) as dispensing with the litigation of liability between the victim and the PCF after one health care provider had paid $100,000.00 in settlement. In reaching that decision, we reasoned that the Medical Malpractice Act contemplates that the issue of liability is generally to be determined between the malpractice victim and the health care provider, either by settlement or by trial, and that the PCF is primarily concerned with the issue of the amount of damages. We also reasoned that payment by one health care provider of the maximum amount of his liability statutorily established that the plaintiff is a victim of that health care provider's malpractice such that the fund cannot contest the admission of liability. Once statutory admission of liability has occurred, we concluded, the only issue between the victim and the PCF is the amount of damages sustained by the victim as a result of the admitted malpractice.
The pronouncements of this Court have therefore been consistent: payment by a qualified health care provider of $100,000 to a malpractice victim in settlement of a claim statutorily admits and establishes his liability, and the only remaining issue is the calculation or assessment of damages.
But does this admission of liability negate the necessity to prove that the alleged malpractice was the cause of plaintiff's alleged damages? Plaintiff says yes; defendant PCF says no.
PCF cites several cases in support of its position that even though liability is deemed admitted, the plaintiff still has to show that the damages he claims were caused by the malpractice at issue. In Cooper v. Sams, 628 *727 So.2d 1181 (La.App. 3rd Cir.1993), plaintiff filed a suit for medical malpractice and products liability. After reaching a settlement with the health care provider, the plaintiff proceeded against the PCF. In addressing the burden of proof issue, the Third Circuit Court of Appeal concluded that when a health care provider's fault has been statutorily admitted and has therefore been established to have caused some damage, the plaintiff must still prove what damage was caused by that fault. 628 So.2d at 1187. The Court cited in support Savelle v. Heilbrunn, 552 So.2d 52 (La.App. 3rd Cir.1989) and Moolekamp v. Rubin, 531 So.2d 1124 (La.App. 4th Cir.1988).
In Savelle, another Third Circuit case, plaintiff brought a medical malpractice claim against a doctor and a hospital, and settled her claim against the doctor and his insurer. She then amended her petition to state a claim against the PCF. In addressing the effect of the settlement, the Third Circuit stated at 552 So.2d at 56-57, citing Moolekamp, supra, in support: "In determining what amount, if any, is to be paid from the Fund, we must decide what damage was caused by Dr. Heilbrunn's fault, the degree of seriousness of that damage, and choose a monetary amount as compensation to the plaintiff for that damage. Thus, the fact that liability is established does not relieve the plaintiff from proving the extent of the damages caused by defendant's fault. Liability implies some damages but not specifically which or how much damage."
Both Cooper and Savelle thus rely on the Fourth Circuit's decision in Moolekamp, supra, as authority for their conclusions. Defendant PCF cites Moolekamp as authority for its position that the plaintiff must prove the amount of damages caused by the statutorily admitted fault. However, upon close examination, the Moolekamp decision does not readily support this conclusion.
In Moolekamp, plaintiff underwent surgery for cataract removal and lens implantation on her right eye. During surgery, a hemorrhage resulted in permanent loss of vision in the right eye. Plaintiff sued the doctor for malpractice and the claim was settled for $100,000. She then proceeded to recover her excess damages against the PCF. The Fund filed a motion in limine seeking a declaration of plaintiff's burden of proof on her demand. The district court ruled that the doctor's negligence was admitted and established, that his liability for the loss of plaintiff's right eye was admitted and established, and that plaintiff did not have to prove the causal relationship between the loss of the right eye and the doctor's negligence. However, the liability of the doctor for the loss of plaintiff's health was not admitted or established and plaintiff would have to prove the causal relationship between the loss of her health "which said loss of health has resulted in her being an invalid since her cataract operation of November 1983" and the negligence of the doctor. 531 So.2d at 1125-1126.
In affirming the district court's ruling, the Fourth Circuit found no error in the conclusion that loss of vision in plaintiff's right eye was the damage necessarily admitted and established by the insurer's paying its policy limits of $100,000. The district court ruling relieved plaintiff from proving that the doctor was liable for loss of vision in her right eye, but the plaintiff was still required to prove any other damages alleged to have been caused by the doctor. The Fourth Circuit interpreted the statutory admission of liability under La.R.S. 40:1299.44(C)(5) as providing an instruction to the court to conclude that the doctor's fault "(his substandard performance of his legal duty to exercise the appropriate standard of care to protect plaintiff from the risks of eye surgery not properly performed) caused plaintiff some damage, which damage, in this case, must be the loss of vision in plaintiff's right eye." 531 So.2d at 1127. Therefore, contrary to the argument of defendant PCF, Moolekamp is authority that proof of causation is not required for all of plaintiff's alleged damages but only for proof of damages not directly related or not part of the original harm caused by the health care provider's admitted fault.
In support of the position that causation need not be proven but is statutorily admitted and established, plaintiff cites the case of Rodriguez v. Louisiana Medical Mutual Insurance, *728 620 So.2d 335 (La.App. 5th Cir. 1993). In this case, the Louisiana Fifth Circuit Court of Appeal reached a different conclusion from that of the Third Circuit on the issue of the need to prove causation after a settlement. The Rodriguez court concluded that based upon the Supreme Court cases of Stuka and Koslowski, the PCF was foreclosed from contesting liability or causation, and was entitled only to appeal the amount of damages owed by the Fund.
In another apparently conflicting circuit decision, the Second Circuit Court of Appeal in Graham v. Willis-Knighton Medical Center, 27,338 (La.App. 2 Cir. 9/29/95); 662 So.2d 161, writ application pending in Supreme Court, 95-2881, held that the district court erred in allowing the PCF to relitigate issues of causation and original harm. Further, in a case arising from the Third Circuit, decided shortly after its decision in the instant case, the court denied writs after the district judge ruled that plaintiffs did not have to prove causation and prohibited the presentation of witnesses with regard to causation at the trial.
To assist in resolving this conflict, plaintiff directs the Court to jurisprudence from Indiana, which provided the model for the Louisiana Medical Malpractice Act. In Dillon v. Glover, 597 N.E.2d 971 (Ind.App. 2 Dist.1992), the Indiana appellate court held that under a provision similar to La.R.S. 40:1299.44(C)(5), once liability is established, the issue of proximate cause is decided. This conclusion was based on the Indiana Supreme Court's observation that "`It is axiomatic that, before liability can be imposed, there must be proof that the defendant's negligence proximately caused the plaintiff's harm.' Dunn v. Cadiente (1987), Ind., 516 N.E.2d 52, 55." 597 N.E.2d at 973. This decision was affirmed by the Indiana Supreme Court. While we note this case with interest, we find sufficient distinction between the Indiana Medical Malpractice Act and the Louisiana Medical Malpractice Act, as argued by defendant, to distinguish this case.[8]
Plaintiff also argues that the key to this dispute is the definition of the term "liability" which should be distinguished from the definition of "fault". Plaintiff cites Brown v. New Orleans Public Service, 506 So.2d 621 (La.App. 4th Cir.1987), a case where plaintiffs alleged they suffered personal and property damage because of the negligence of the utility company when they were without electrical power for several hours during a freeze. The Court rejected a request for class certification on the grounds that there were different causation issues for the individual plaintiffs. The Brown court noted that CCP art. 593.1[9] authorized separate trials on separate issues but did not allow a trial on fault alone separate from the question of causation: "Tort liability, however, encompasses both fault and causation, and Article 593.1 does not allow trial on fault alone, separate from the question of causation.... Fault and causation as elements of liability are too closely interrelated to be tried separately, and sound policy reasons dictate that a defendant should not be subjected to a determination of his fault before the court even considers whether that fault caused the plaintiffs' damages." 506 So.2d at 624. Thus, plaintiff argues, once liability is established, causation and fault have already been proven, so an admission of liability is inherently an admission of fault and causation.

DISCUSSION
In resolving this issue, we keep certain tenets in mind. First, as stated above, the Medical Malpractice Act is to be *729 strictly construed against limiting the tort claimant's rights against the wrongdoer. Second, the admission of liability clause in La.R.S. 40:1299.44(C)(5) was arguably enacted to offset in part the advantages to health care providers of the $500,000 damages cap. Third, settlements are favored in our law, so we should not discourage plaintiffs from settling medical malpractice cases by interpreting a statute so as to create a post-settlement burden of proof when another interpretation is reasonable. Fourth, a plaintiff does not have to prove what has been admitted. The issue then becomes determining exactly what is admitted and established when a health care provider makes the $100,000 payment.
If we adopt defendant's position that the plaintiff is required to prove the causal connection between all damages and the admitted malpractice, then the statutory admission of liability under La.R.S. 40:1299.44(C)(5) becomes much less significant, if not meaningless. If we accept plaintiff's view that absolutely no proof of a causal connection is necessary regarding all medical consequences alleged, then the admission of liability by a health care provider and/or his insurer may well trigger PFC exposure for secondary or sequential medical conditions totally unrelated to the health care provider's negligent conduct.
Consideration of our recent case of Jones v. St. Francis Cabrini Hosp., 94-2217 (La. 4/10/95); 652 So.2d 1331 assists us in solving this dilemma. In Jones, Mrs. Ruby Lee Jones was admitted to the hospital with a broken hip. Dr. John Weiss performed surgery to place a screw nail in the bone to compress the fracture. However, prior to surgery, blood tests were performed which suggested that plaintiff had anemia. Tests were ordered to determine if there was bleeding in the stomach or colon which is usually indicated when someone of Jones' age has anemia. The first two tests revealed no bleeding. The third test was conducted via a barium enema. The flow of barium did not progress as expected, and the radiologist performing the test concluded that the barium was collecting outside of Jones' rectum and that a pararectal tear had apparently occurred. After consultation with other doctors, Dr. Harishwar Agarwal performed a colostomy. The bowel was cut in two, the fecal stream directed to a bag outside of the body, and the lower half of the colon stapled or sutured closed.
Jones remained in the hospital to convalesce from the hip surgery and the colostomy. While at the hospital, a nurse caused Jones to put weight on her leg contrary to doctor's orders, resulting in some compression or separation of the bone in her hip. Jones then requested a transfer to another hospital where she stayed for one month before returning to her prior nursing home residence.
About a month later, Jones returned to the hospital for a reversal of the colostomy despite her doctor's attempt to dissuade her because of the risks involved. Shortly after the reversal, she developed severe complications requiring that ileostomy be performed eleven days later. Jones began bleeding within three days of the first ileostomy so a second ileostomy was done. The bleeding continued, and about one month after being admitted to the hospital for the colostomy reversal, Jones died.
Jones' heirs filed suit against the hospital where the hip surgery and colostomy was performed, Dr. Baber who was the radiologist who performed the barium enema, and his insurer. The petition included ten allegations of negligence relating to the rectal perforation and only one relating to the hip separation. The hospital settled, and plaintiffs reserved their rights to proceed against the PCF. After trial, the jury rendered a verdict of $57,500, and the district court gave the Fund a credit for prior settlements. Plaintiffs appealed. Finding the jury's verdict sheet contained internal inconsistencies, the Court of Appeal performed a de novo review and held that the hospital's $100,000 settlement constituted an admission of liability for both the separated hip and perforated rectum. It awarded damages for the hip separation, rectal perforation and resulting colostomy. No damages were awarded for the reversal of the colostomy and subsequent death.
In reviewing the Court of Appeal decision, we considered whether the jury charges *730 could have misled the jury. The questionable charge on damages stated:
Damages. We next come to the issue of damages. In this case while the fault or liability of St. Frances Cabrini to the plaintiff is established, the plaintiff at trial must nonetheless demonstrate what damages by kind and by seriousness were caused by St. Frances Cabrini's fault.
We concluded that this charge in combination with the PCF's closing argument could indeed have misled the jury. So it was proper for the court of appeal to accord no weight to the jury verdict and to decide this case on a de novo review of the record without deference to the findings of the jury. Yet we disagreed in part with the Court of Appeal judgment. We concluded that the original harm did in fact include the reversal of the colostomy and Jones' subsequent death. We performed a duty/risk analysis and concluded that the rectal perforation (for which Cabrini statutorily admitted liability) was clearly a cause in fact of the reversal of the colostomy, since the reversal would not have been necessary but for the rectal perforation. We then determined that the hospital's duty not to injure patient Jones encompassed the risk that she would undergo a procedure to correct the original harm which would ultimately result in her death. We therefore found that the hospital's admitted liability extended to the reversal of the colostomy, contrary to the conclusion of the court of appeal.
In essence, we considered in Jones the hospital's admission of liability and determined what damages were connected with the original harm of the malpractice. In defining "original harm" caused by the malpractice, we essentially concluded that it was such harm or risk which was encompassed by the duty of the health care provider not to commit medical malpractice or perform at a substandard level of care. No further analysis of causation was required, nor was plaintiff required to prove that the original harm was caused by the medical malpractice.
Extrapolating from Jones and after reviewing the provisions of the Medical Malpractice Act and the applicable jurisprudence, we adopt the test hinted at by the court in Moolekamp; that is, that liability under La.R.S. 40:1299.44(C)(5) is admitted and established as to damages emanating from the original apparent consequences or harm from the medical malpractice. Original or primary harm is such risk and consequential damages that are encompassed by the health care provider's duty not to commit medical malpractice, and which directly result from the health care provider's breach of duty or medical malpractice. Secondary harm is all other damages which plaintiff alleges were caused by the medical malpractice. For example, in a case where medical negligence causes paraplegia, and the patient dies not too long afterwards because of a heart attack, the original or primary harm would be the loss of control of patient's lower limbs and the secondary harm might be the subsequent death by heart attack, if proven to be causally related to the malpractice. We hold today that when a health care provider admits and establishes liability by payment of $100,000 under the Medical Malpractice Act, under La.R.S. 40:1299.44(C)(5), claimant is relieved of the obligation to prove a causal connection between the admitted malpractice and claimant's original and primary harm. However, if claimant is asserting claims for secondary damages, then he has the burden, notwithstanding admitted liability by virtue of the $100,000 settlement and La.R.S. 40:1299.44(C)(5), to prove that this secondary harm was caused by the medical negligence.
It is the duty of the district judge once he has approved the settlement to distinguish between the original or apparent harm which the admission of liability encompasses and the secondary harm concerning which the plaintiff continues to bear the burden of proof. This determination shall be made by a close review of the record consisting of the pleadings, discovery and any trial proceedings. In most cases, it is not difficult to ascertain the extent of the original or primary harm caused by the medical malpractice which the health care provider has by settlement admitted, as distinguished from secondary harm. Drawing a line between the two is a chore to be performed by *731 the trial judge.[10]
This test achieves the goal of the statute's admission of liability provision by relieving plaintiff of the burden of proving a causal connection between the admitted malpractice and the original or main harm giving rise to damages; yet, it provides limits so as to prevent automatic PCF exposure for all medical conditions that might occur subsequent to the medical negligence.[11]
We therefore conclude that in the case at bar plaintiff is not required to prove any causal connection between Dr. Barrett's admitted malpractice and the original harm suffered by Pendleton and/or the plaintiff. Although we have the benefit of the pleadings in the record, we do not have the benefit as did the district court of trial testimony in this case for the reasons opreviously noted in footnote 1. Therefore, we remand this matter to the district court to consider the record in its entirety, including the pleadings, discovery and trial testimony, to determine the scope of the original harm if evident or apparent and consequential damages caused by Dr. Barrett's malpractice. Regarding any and all secondary harm, or harm not primary, the district court should perform a duty/risk analysis, Weber v. Charity Hospital of Louisiana, 475 So.2d 1047 (La.1985), and determine whether the secondary damages are the consequence of the type of risk of harm encompassed in Dr. Barrett's duty of care. If any harm is found to be primary, then Dr. Barrett's admission of liability binds the PCF for all damages arising out of that primary harm. If harm of a secondary sort is found and also falls within the scope of Dr. Barrett's duty, then the plaintiff's proof must establish a causal connection between the defendant's breach of duty and that secondary harm and consequent damages.

DECREE
For the foregoing reasons, we reverse the decision of the Court of Appeal in part and remand to the district court for further proceedings consistent herewith.[12]
REVERSED IN PART AND REMANDED TO THE DISTRICT COURT.
MARCUS and LEMMON, JJ., dissent and assign reasons.
VICTORY, J., dissents for the reasons assigned by LEMMON.
MARCUS, Justice (dissenting).
In my opinion, under La.R.S. 40:1299.44(C)(5), the court must determine the amount for which the fund is liable, i.e., damages caused by the admitted and established liability of the health care provider after one hundred thousand dollars has been paid in settlement. In other words, plaintiff has the burden to prove what damages in excess of $100,000 were caused by the admitted *732 liability (fault and damages of $100,000) of the health care provider. Accordingly, I respectfully dissent.
LEMMON, J., dissenting.
The Legislature, by providing in La.Rev. Stat. 40:1299.44C(5) that "the court shall consider the liability of the health care provider as admitted and established" when there is a settlement payment of $100,000 on behalf of any qualified health care provider, contemplated that such a payment constitutes an admission (1) of malpractice by the provider and (2) of causation by the malpractice of damages of at least $100,000. The intent of Section 1299.44C(5) was to prevent a health care provider from paying his or her statutory limits of liability of $100,000 to be released from the action without any admission of malpractice or of liability because of the $100,000 paid for the release. Thus, "liability," as used in Section 1299.44C(5), means an admission of liability for the malpractice and for the $100,000 paid in damages.
Under the scheme of the Act, the malpractice victim, upon settlement payment of $100,000 by a qualified health care provider, is relieved of the frequently difficult and expensive burden of proving malpractice and causation of the first $100,000 in damages. Thereafter, "the only issue between the victim and the PFC is the amount of damages [in excess of $100,000] sustained by the victim as a result of the admitted malpractice." Russo v. Vasquez, 94-2407 (La. 1/17/95); 648 So.2d 879, 883. (emphasis added). As in any other tort case in which "liability" is admitted, the plaintiff in a medical malpractice case under the Act has the burden of proving that the admitted fault of the tortfeasor caused the damages sought by the tort victim in excess of $100,000.
The Legislature, in enacting La.Rev.Stat. 40:1299.44C(5), apparently utilized the phrase "liability" in the same manner utilized in authorizing separate trials of "liability" and "damages" in La.Code Civ.Proc. arts. 1562 and 1915. When the issues of "liability" and "damages" are bifurcated under these articles, the court separately tries (1) the issue of the defendant's "liability" based on his or her fault and (2) the issue of the damages caused by that fault. This interpretation of the word "liability" has worked well in that context, and I have not been shown any reason to conclude that the Legislature intended any other meaning of the word "liability" in Section 1299.44C(5).
NOTES
[*] Because of the vacancy created by the resignation of Dennis, J., now a judge on the United States Court of Appeals for the Fifth Circuit, there was no justice designated "not on panel" under Rule IV, Part II, § 3. Panel included Chief Justice Calogero and Justices Marcus, Watson, Lemmon, Kimball, Johnson and Victory.
[1] The parties mentioned facts in the petition, the briefs and in oral argument which evidently were adduced during a partial trial of this matter. What occurred during that partial trial is irrelevant to the resolution of the legal issue before us, and so our recitation of the facts is limited to the pleadings in the record. Further, the record did not contain a transcript of these prior proceedings.
[2] Excerpted from "Defendant's Position on the Issues," pp. 1, 4.
[3] The trial court also ruled in response to a request by the PCF that it would be required to post a Jury Cost Bond in order to continue a jury trial. The PCF filed a writ application and this ruling was reversed by the Court of Appeal.
[4] If a health care provider does not follow the requirements for qualifying under the Act, he or she cannot take advantage of the limitation on medical malpractice liability.
[5] La.R.S. 40:1299.44(C)(5) states:

At the hearing the board, the claimant, and the insurer of the health care provider or the self-insured health care provider as the case may be, may introduce relevant evidence to enable the court to determine whether or not the petition should be approved if it is submitted on agreement without objections. If the board, the insurer of the health care provider or the self-insured health care provider as the case may be, and the claimant cannot agree on the amount, if any, to be paid out of the patient's compensation fund, then the court shall determine the amount of claimant's damages, if any, in excess of the amount already paid by the insurer of the health care provider. The court shall determine the amount for which the fund is liable and render a finding and judgment accordingly. In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund, the court shall consider the liability of the health care provider as admitted and established, where the insurer has paid its policy limits of one hundred thousand dollars, or where the self-insured health care provider has paid one hundred thousand dollars.
[6] To trigger access to the PCF, the entire policy limits of $100,000 have to be paid to the malpractice claimant. In Russo v. Vasquez, 94-2407 (La. 1/17/95); 648 So.2d 879, we made it clear that payment of less than $100,000 with credit for prompt payment, or any other reason, could not be considered to meet the statutory threshold.
[7] Koslowski was overruled by Russo v. Vasquez, supra. See footnote 6.
[8] First, there is no language in the Indiana Medical Malpractice Act comparable to La.R.S. 1299.41(1) which provides that "[n]othing in this Part shall be construed to make the Patient's Compensation Fund liable for any sums except for those arising from medical malpractice." Second, the Indiana Act does not create an entity comparable to the PCF Oversight Board. Third, the Indiana Act has no provisions comparable to La.R.S. 40:1299.44(D)(2)(b)(x) and (xi) which provide a mechanism for proving that a claimant's damages were caused in whole or in part by the negligence or liability of a non-qualified health care provider or product manufacturer and for reimbursement and indemnity for such amounts.
[9] La.CCP art. 593.1 provides the procedure for class action proceedings.
[10] We acknowledge that this is one of the more difficult cases in which to distinguish between original and secondary harm because it involves negligent failure to diagnose cancer and the consequences of delay. Nonetheless, the judge heard the case and is at liberty to take further evidence if he concludes it is too difficult to decide without more information what primary harm resulted from the neglect to diagnose and treat the malignant tumor. It is possible that some harm, short of the patient's early death, identifiable as apparent or primary harm, was the consequence of the doctor's negligence. It is for the district court judge to determine in this case just what constitutes the primary harm as to which plaintiff is relieved of his burden of proving causation. That decision on his part may be difficult, but it is the kind of decision district court judges and fact finders make on a regular basis.
[11] In a case pending in this Court on writ application, the Second Circuit applied this test. In Graham v. Willis-Knighton Medical Center, supra, the court looked to the discovery, pleadings and trial to determine the extent of the "original harm".
[12] Because of the unique procedural posture of this case, that is, an incomplete trial against the original defendants resulted in a settlement which triggered claims against the PCF which gave rise to the legal issues we visit herein, we are not bound by Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975) which cautions against remand to the trial court when the court of appeal has the full record before it. Moreover, our decision sets forth new parameters for resolution of the legal issue we consider today, and it is the district court, in this case and others to come, which must make the decision on primary and secondary harm which we have determined is necessary for proper application of R.S. 40:1299.44(C)(5).