690 So.2d 883 (1997)
Bessie M. GRAHAM, et ux., Plaintiff,
v.
David BURKETT, M.D., Defendant.
No. 29261-CW.
Court of Appeal of Louisiana, Second Circuit.
February 26, 1997.
*884 John L. Hammons, Allen Parker Self, Jr., Shreveport, for Plaintiff.
Jessie D. McDonald, Brady D. King, II, Monroe, for Defendant.
Before HIGHTOWER, WILLIAMS and CARAWAY, JJ.
WILLIAMS, Judge.
In this medical malpractice case, the Patient's Compensation Fund ("PCF"), appeals a trial court's finding in favor of the plaintiffs, Bessie and Jack Graham, that all injuries claimed by the Grahams in their "Motion To Establish Original Harm" constitute original harm caused by Dr. David Burkett's malpractice. For the following reasons, we affirm *885 in part, reverse in part, and remand for further proceedings.

FACTS
While under the care of Dr. Joan Blondin, a specialist in internal medicine, Mrs. Bessie Graham, a thirty-two-year-old smoker with a history of rheumatic heart disease, was admitted to Saint Francis Medical Center in Monroe, Louisiana for treatment of tachycardia and dyspnea (rapid heart rate and difficulty breathing, respectively). Dr. Blondin called in Dr. David Burkett, a cardiologist, as a consultant on Mrs. Graham's case. Dr. Burkett administered several tests to Mrs. Graham and his preliminary diagnosis was "a dilated cardiomyopathy with moderate, severe reduction in global left ventricular functioning secondary to either idiopathic myocarditis or more probably related to the cardiomyopathy of rheumatic heart disease." Dr. Blondin testified in her deposition that Dr. Burkett's diagnosis meant that Mrs. Graham's heart muscle was not contracting as well as it should have been. In connection with his diagnosis, Dr. Burkett recommended a heart catheterization, so that he could biopsy Mrs. Graham's heart and rule out other possible problems. Dr. Burkett also believed that Mrs. Graham's problem was chronic, and in addition to several other recommendations regarding treatment and diet,[1] he recommended that Mrs. Graham obtain a psychiatric consultation to aid in dealing with the "chronicity" of her disease.
Dr. Burkett performed the heart catheterization on October 29, 1988. Shortly thereafter, Mrs. Graham began experiencing sharp chest pains. Dr. Burkett had gone out of town after the heart catheterization, and Dr. Koepke covered for Dr. Burkett. Upon examining Mrs. Graham and conducting various tests, Dr. Koepke discovered that Mrs. Graham had suffered a puncture of the heart muscle during the heart catheterization. Dr. Koepke testified, via deposition, that he performed an echocardiogram that showed evidence of fluid around Mrs. Graham's heart, and he opined that she had bleeding into the pericardium which is the wall of the heart. Those symptoms constitute a condition known as pericarditis. Dr. Koepke opined that Mrs. Graham developed the pericarditis as a result of the heart puncture.
Mrs. Graham's pericarditis was treated with steroids, including Prednisone, for approximately six months. However, the steroid therapy did not reduce the accumulation of fluids around Mrs. Graham's heart, and she continued to experience chest pains and other complaints. In April of 1989, Dr. John Henry Smith performed a pericardiectomy (removal of the pericardium) to relieve the pericarditis. Since the pericardiectomy, several doctors have treated Mrs. Graham for various medical problems. Dr. Blondin testified that she has treated Mrs. Graham for interstitial lung disease, and hepatitis. Mrs. Graham has also been treated for a urinary tract infection and has had her gall bladder removed. Dr. Blondin also testified that she and other physicians have speculated that Mrs. Graham suffers from collagen vascular disease, but they have never been able to confirm that diagnosis. Mrs. Graham was evaluated at the Mayo Clinic in 1991 by Dr. Timothy Christian. He reported that the heart palpitations she was experiencing may have been in some way related to the pericardiectomy and residual adhesions. However, that diagnosis was speculative.
Dr. Koepke saw Mrs. Graham again in 1994 for fatigue, dyspnea, and chest pain. He testified that after he evaluated Mrs. Graham, his first impression was that her recurrent chest pain was possibly related to pericardial adhesions (scar tissue) resulting from the pericardiectomy. However, he noted that Mrs. Graham was experiencing the above complaints even prior to the heart catheterization, and that he thought it was more likely that the pain was a result of something other than the adhesions from the pericardiectomy. Dr. Koepke further testified that he also performed a test which indicated an abnormality of the muscle function of Mrs. Graham's heart which is unrelated to the pericardiectomy.
When asked whether the chest pains, shortness of breath, reduced energy levels *886 and tachycardia Mrs. Graham experienced after the pericardiectomy were related to the initial heart puncture, both Dr. Blondin and Dr. Koepke testified that they could not relate those symptoms to the heart puncture or the pericardiectomy. Both doctors noted that Mrs. Graham had exhibited those symptoms prior to both surgeries.
In October of 1989, Mrs. Graham and her husband filed a medical malpractice suit against Dr. Burkett and his insurer, the Louisiana Mutual Medical Insurance Company. Dr. Burkett and his insurer entered into a $100,000 settlement agreement with the Grahams which the trial court approved on October 1, 1991.
Thereafter, the Grahams filed suit against the Louisiana Patient's Compensation Fund, through Dr. Burkett as the nominal defendant, for excess damages. The Grahams alleged that the pain which Mrs. Graham suffered immediately after the heart puncture, her pericarditis, side effects from steroid treatment of the pericarditis, high fever, and inability to perform secretarial work and care for her home and family were all results of Dr. Burkett's malpractice. The Grahams also alleged that Mrs. Graham had suffered depression, insomnia, anxiety, and an increased risk of complications from the steroid therapy. They further alleged that Mr. Graham was unable to operate his business properly due to caring for his wife, which inability resulted in financial hardship to the Graham family.
Dr. Burkett answered the lawsuit as the nominal defendant. He admitted to puncturing Mrs. Graham's heart during the heart catheterization and admitted that some of Mrs. Graham's chest pains for a period of time following the heart puncture were causally related to the heart puncture. Dr. Burkett also admitted that Mrs. Graham experienced anxiety as a result of the heart puncture. However, Dr. Burkett alleged that the chest pains which were causally connected to the heart puncture did not extend beyond a few months past Mrs. Graham's pericardiectomy. Dr. Burkett also generally admitted liability within the limits of the Louisiana Medical Malpractice Act and further denied causation as to all other claims not covered by his specific and general admissions. Dr. Burkett requested a trial by jury, and the PCF timely posted a jury bond.
While this lawsuit was pending, the Louisiana Supreme Court decided Pendleton v. Barrett, 95-2066 (La. 5/31/96), 675 So.2d 720, in which it held that once a settlement of $100,000 has been reached between a plaintiff and a health care provider in a medical malpractice case, a trial judge must make a determination of which of the plaintiff's harms are "original" and which are "secondary." With regard to original harm(s), the health care provider has admitted liability by virtue of the settlement, and thus, the plaintiff need not prove causation as to those harms in order to recover excess damages. However, with regard to secondary harms, the plaintiff must still prove causation to recover excess damages. Pendleton v. Barrett, supra at 730.
After the decision in Pendleton v. Barrett, supra was handed down, the Grahams moved for a determination of original harm. The parties submitted memoranda and attachments to the trial court. After a review of the parties' submissions, the trial court ruled that all injuries alleged by the Grahams in their motion to establish original harm did indeed constitute original harm.[2] The PCF, through Dr. Burkett, applied to this court for supervisory writ. This court granted the writ application and docketed this case as an appeal. Bessie Marie Graham v. David *887 Burkett, M.D., 29,261 (La.App. 2d Cir. 9/26/96).

DISCUSSION
The PCF contends the trial court erred in making a preliminary finding of original harm, as per the dictate of Pendleton v. Barrett, supra. The PCF argues that the trial court's grant of a Pendleton hearing and its subsequent ruling denying the PCF's right to a jury trial on all issues was erroneous, because Pendleton was not decided until five years after this lawsuit was filed, and the PCF had a right to a trial by jury on all issues at the time the nominal defendant filed his answer. We disagree.
LSA-R.S. 40:1299.44(C)(5) provides the method of approving settlements between a malpractice claimant and a health care provider. The statute provides in pertinent part:
... If the board, the insurer of the health care provider or the self-insured health care provider as the case may be, and the claimant cannot agree on the amount, if any, to be paid out of the patient's compensation fund, then the court shall determine the amount of claimant's damages, if any, in excess of the amount already paid by the insurer of the health care provider. The court shall determine the amount for which the fund is liable and render a finding and judgment accordingly. In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund, the court shall consider the liability of the health care provider as admitted and established, where the insurer has paid its policy limits of one hundred thousand dollars, or where the self-insured health care provider has paid one hundred thousand dollars.
The PCF has a right to a jury trial on the issue of excess damages. Stuka v. Fleming, 561 So.2d 1371 (La.1990), rehearing denied, June 28, 1990, cert. denied, 498 U.S. 982, 111 S.Ct. 513, 112 L.E.2d 525 (1990). Therefore, the question becomes exactly what evidence must be presented to a judge or jury so that a determination of excess damages can be made. Prior to the decision in Pendleton v. Barrett, supra, several circuits ruled that a claimant must prove a causal connection between the admitted malpractice and all of his damages. See Cooper v. Sams, 628 So.2d 1181 (La.App. 3rd Cir.1993), writs denied, 632 So.2d 766, 767; see also Savelle v. Heilbrunn, 552 So.2d 52 (La.App. 3rd Cir.1989) writ denied, 556 So.2d 1267.
However, in Pendleton v. Barrett, supra, the Louisiana Supreme Court clarified the rule in Moolekamp v. Rubin, 531 So.2d 1124 (La.App. 4th Cir.1988) upon which Cooper v. Sams, supra and Savelle v. Heilbrunn, supra rely. The supreme court noted that in Moolekamp v. Rubin, supra, the fourth circuit held that liability as to the plaintiff's original harm, the loss of her eye, was established by the defendant's $100,000 settlement with the plaintiff. However, in order to recover excess damages, plaintiff had to prove the causal connection between the malpractice and the loss of her health, a side effect or secondary harm of the malpractice. Thus, Moolekamp v. Rubin, supra is authority for the proposition that a claimant against the PCF is not required to prove causation with regard to all of his alleged damages, but only with regard to the damages not directly related to or not a part of the original harm caused by the health care provider's admitted fault.
Based upon the proper interpretation of Moolekamp v. Rubin, supra, which was decided prior to the filing of the nominal defendant's answer in the instant case, the PCF never had the right to a jury trial at which it could plead a lack of causation defense with regard to damages that constitute original harm. Pendleton v. Barrett, supra merely clarifies the existing case law. Thus, the trial court's pre-trial determination did not deprive the PCF of the right to a jury trial.
The PCF also asserts as error the trial judge's finding that all injuries the Grahams alleged in their "Motion To Establish Original Harm" indeed are original harms. We agree that some of the Grahams' injuries are not damages emanating from the original harm.
We do not set aside a trial court's finding of fact in the absence of manifest error, or unless the finding is clearly wrong. *888 Rosell v. ESCO, 549 So.2d 840 (La.1989). The issue is not whether the trial court was right or wrong, but whether its conclusion was a reasonable one. Stobart v. State of Louisiana through the Department of Transportation and Development, 617 So.2d 880, 882 (La.1993).
The trial judge concluded that all injuries the Grahams alleged were "foreseeable" consequences of the heart puncture, the admitted act of malpractice. However, foreseeability is not the correct test. As enunciated by the Louisiana Supreme Court in Pendleton v. Barrett, supra, original harm is that which is encompassed by the health care provider's duty not to commit medical malpractice, and which directly results from the health care provider's breach of duty or medical malpractice. An injury which is a foreseeable result of the medical malpractice is not necessarily a "direct result" of the malpractice. Thus, the Grahams' allegations must be reviewed to determine which of their injuries are a direct result of Dr. Burkett's admitted malpractice and which are secondary results. The Grahams alleged that the puncture of Mrs. Graham's heart is original harm, and the PCF, through Dr. Burkett, admitted the same. Thus, the Grahams do not have to prove causation with regard to the heart puncture. We now review the remainder of the injuries alleged by the Grahams to determine whether they constitute original harm caused by the medical malpractice.

Severe chest pain[3]; bleeding from the heart; accumulation of fluid around the heart (pericarditis)

Dr. Blondin and Dr. Koepke, two of Mrs. Graham's treating physicians, both testified that a puncture of the heart muscle would cause chest pain, as well as the bleeding from the heart and the accumulation of fluid around the heart (pericarditis). Further, Dr. Koepke testified that Mrs. Graham's complaint of severe chest pain led to the tests by which he discovered the accumulation of fluid around and bleeding from Mrs. Graham's heart, and subsequently discovered the heart puncture. Based on the doctors' testimony, Mrs. Graham's chest pains through the time of the pericardiectomy and her pericarditis can reasonably be considered a direct result of the heart puncture.

Steroid therapy resulting in nausea, vomiting and joint pain; subsequent surgery (pericardiectomy)
Dr. Koepke testified that the usual treatment for pericarditis is to initially treat a patient with nonsteroidal anti-inflammatory drugs. If nonsteroid drugs do not work, then steroids or Prednisone is used. Dr. Koepke testified that Mrs. Graham was initially treated with nonsteroid drugs, then with Prednisone. Mrs. Graham underwent the pericardiectomy after drug therapy did not relieve her pericarditis.
With respect to the Prednisone therapy which resulted in nausea, joint pain and vomiting, we find that the need for Prednisone therapy and the cost of this treatment constitute original harm, since according to Dr. Koepke's testimony, the therapy was the initial step taken to combat the pericarditis, a direct result of the heart puncture. However, other than the Grahams' allegations, there is little documentation of Mrs. Grahams' nausea, joint pain and vomiting in the record.[4] Nor is there evidence that these symptoms can result from the use of Prednisone. Dr. Koepke testified regarding possible side effects of steroid therapy. However, none of the symptoms alleged by the Grahams were included in the possible side effects listed by Dr. Koepke. Additionally, Dr. *889 Blondin testified that she thought Mrs. Graham's joint pain was a result of the suspected collagen vascular disease. Because the record does not show that the alleged symptoms were related to the Prednisone therapy or the initial heart puncture, the Grahams must prove a causal link between the heart puncture and the nausea, vomiting, and joint pain.
Dr. Koepke indicated in his deposition testimony that surgery to remove the pericardium is always an option to relieve pericarditis. If pericarditis compromises the heart's function, then surgery will be necessary "early on" after the pericarditis is detected. If pericarditis persists despite drug therapy, removal of the pericardium is necessary to relieve the pericarditis and the resulting pain. Based on Dr. Koepke's testimony, we find that the pericardiectomy which Mrs. Graham underwent is a direct result of the heart puncture and is thus original harm.

Wound dishesion, ulcerated cellulitis, drainage from chest tube site, fever
A review of the record reveals that Mrs. Graham experienced most of these symptoms after undergoing the pericardiectomy. Neither Dr. Blondin nor Dr. Koepke testified that these symptoms were caused by the heart puncture. Dr. Koepke felt that the ulcerated cellulitis and drainage from the chest tube site were connected to the heart puncture, since those symptoms relate to the wounds Mrs. Graham sustained as a result of the pericardiectomy. With regard to fever, Dr. Blondin testified that Mrs. Graham frequently experienced low-grade fever prior to the heart puncture. There is no evidence in the record to show that any fever Mrs. Graham experienced was directly related to the heart puncture. Based on Dr. Koepke's and Dr. Blondin's testimony, we find that the wound dishesion, ulcerated cellulitis, drainage from the chest tube site, and fever were, at best, direct results of the pericardiectomy, but were not directly related to the heart puncture. Thus, these symptoms are secondary harms and the Grahams must prove that they are causally related to the heart puncture.

Continued chest pain; periodic tachycardia; shortness of breath
There is no evidence in the record before us to show that Mrs. Graham's continued chest pain, shortness of breath, reduced energy levels and diminished activity, and periodic tachycardia (trouble breathing) are original harms resulting from the heart puncture. Dr. Blondin and Dr. Koepke testified that Mrs. Graham experienced the tachycardia and chest pain prior to the heart puncture. The purpose of the heart catheterization during which the puncture occurred was to diagnose the cause of those symptoms. Further, Dr. Koepke testified that the chest pain could possibly have been due to adhesions Mrs. Graham sustained as a result of the pericardiectomy. If in fact this is the case, the chest pains would be a direct result of the pericardiectomy rather than the heart puncture. Thus, these symptoms must be considered secondary harm.

Depression; anxiety; insomnia
The nominal defendant admitted in his answer that Mrs. Graham experienced anxiety as a result of the heart puncture. However, there is no evidence in the record to show that this anxiety extended beyond the pericardiectomy which corrected the direct results of the heart puncture. Therefore, we find that any anxiety experienced following the pericardiectomy is not original harm, but rather secondary harm.
With regard to depression and insomnia, Mrs. Graham's medical records show that she experienced these symptoms at times during the remainder of her hospitalization to recover from the heart catheterization and puncture, and these symptoms were related to the pain she was experiencing. Thus, the trial judge could reasonably have found that depression and insomnia during the initial hospitalization were original harms resulting from the heart puncture. However, other than the allegations in the Grahams' petition for damages and motion to establish original harm, there is nothing in the record to indicate that Mrs. Graham actually suffered depression and insomnia after the initial hospitalization during which the heart puncture occurred. Thus, any depression *890 and insomnia experienced subsequent to her initial hospitalization are secondary harms.

Mr. Graham's loss of consortium
Other than the allegation in the Grahams' motion to establish original harm, there is no evidence in the record before us to establish that Mr. Graham actually experienced a loss of consortium or how such a loss resulted from the heart puncture. Therefore, there is nothing upon which to base a finding that Mr. Graham's alleged loss of consortium is an original harm, and the Grahams must prove this loss and its relation to Dr. Burkett's medical malpractice.

CONCLUSION
Based on the record, we affirm the trial court's finding that the following injuries to Bessie Graham constitute an original harm emanating from Dr. Burkett's medical malpractice: severe chest pain from the time of the heart puncture through the pericardiectomy; bleeding from the heart; pericarditis; steroid therapy; the pericardiectomy; anxiety from the time of the heart puncture through the pericardiectomy; and, depression and insomnia during Mrs. Graham's initial hospitalization. We reverse the trial court's finding that the following injuries constitute original harm emanating from Dr. Burkett's medical malpractice: nausea, vomiting, and joint pain resulting from the steroid therapy; wound dishesion; ulcerated cellulitis; drainage from chest tube site; fever; continued chest pain; periodic tachycardia; shortness of breath; anxiety subsequent to the pericardiectomy; and, depression and insomnia subsequent to Mrs. Graham's initial hospitalization. Costs of this appeal are assessed equally between the PCF and the Grahams.
AFFIRMED IN PART; REVERSED IN PART; REMANDED.
NOTES
[1] Dr. Burkett recommended a no added salt diet for Mrs. Graham, that she stop smoking, and that she be considered for a heart transplant at some future time.
[2] The Grahams alleged that the following injuries to Mrs. Graham constituted original harm: puncture of the heart muscle; severe chest pain; bleeding from the heart; accumulation of fluid around the heart; pericarditis; steroid therapy resulting in nausea, vomiting and joint pain; subsequent surgery (pericardiectomy); wound dishesion, ulcerated cellulitis, drainage from chest tube site, fever; continued chest pain; shortness of breath; reduced energy levels and diminished activity; periodic tachycardia; depression; anxiety; and, insomnia. They also alleged Mr. Graham's loss of consortium as an original harm. The trial court submitted a letter to both parties which indicated that all of the injuries alleged in the Grahams' motion would be considered original harms emanating from the medical malpractice.
[3] The PCF, through Dr. Burkett, admitted in its answer and its submission on original harm that some of Mrs. Graham's chest pains were related to the heart puncture. However, it is unclear which chest pains the PCF admits and which pains it denies. Thus, our review will encompass all allegations of chest pain by the Grahams.
[4] The record does contain some medical reports which show that Mrs. Graham experienced some nausea while she was recovering from the heart catheterization and puncture during her initial hospitalization. However, these reports do not show that Mrs. Graham was given Prednisone for any reason during her initial hospital stay. The only reference, with regard to joint pain, other than the Grahams' allegations, is Dr. Blondin's testimony infra.